364 A.2d 312
**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Arthur PERRY, Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued March 30, 1976.

Decided Oct. 8, 1976.

516

Michael J. Stack, Jr., Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Benjamin Levintow, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

**· OPINION OF THE COURT**

EAGEN, Justice.

Appellant, Arthur Perry, was convicted by a jury in Philadelphia of murder of the first degree, conspiracy, aggravated robbery and burglary. Post verdict motions were filed and denied. Perry was sentenced to life imprisonment on the murder conviction, was given a suspended sentence on the conspiracy conviction, ten to twenty years imprisonment on the aggravated robbery conviction and ten to twenty years imprisonment on the burglary conviction. The sentences on the burglary and robbery convictions were to run concurrently with one another but both were to run consecutively to the sentence on the murder conviction. These appeals followed.[1]

The record establishes these facts. On February 9, 1972, two men entered the Choo-Choo Bar in Philadelphia. The first, later identified as the appellant Perry, ordered a beer and then left. Shortly thereafter, he returned and sat down toward the front of the bar. The second man, identified by the barmaid as Joseph Watson with whom the barmaid attended school, entered through the side door armed with a shotgun. Watson announced that there was to be a robbery and the two men ordered all the patrons into the restrooms at the rear of the bar. One patron, Douglas Alexander, an off-duty police officer, waited for the other patrons to get to the rear of the bar, then drew his service revolver and shot Watson in the left thigh. Watson fired his weapon at Alexander and fatally wounded him. Perry helped Watson to leave the bar and the two then fled in a stolen automobile.

Perry took Watson to his girl friend's apartment where Perry attempted to care for Watson while the two

---

1. Appeals from the judgments of sentence on the robbery, burglary and conspiracy convictions were filed in the Superior Court, and later certified to this Court and consolidated for disposition with the appeal from the murder conviction.

hid from the authorities. Perry's girl friend helped him to secure bandages for Watson but told Perry that she wanted Watson and the gun out of her house when possible. On February 10th, Perry helped Watson out of the apartment and led him to a porch across the street where he would be found and given medical attention. Perry was confident that Watson would not implicate him. However, when the police, who were looking for Watson from the personal identification given by the barmaid, questioned Watson in the hospital, he gave a statement which not only incriminated himself but implicated Perry and gave the police an address where he might be found. Patrolmen were radioed, told of the information received from Watson and directed to apprehend Perry. The officers entered the apartment where Perry was located and arrested him without a warrant.

First, Perry contends that the lower court erred in permitting evidentiary use of an incriminating statement he made while in police custody, claiming it was the product of an unnecessary delay under Pa.R.Crim.P. 118 [now Rule 130] and *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972) and its progeny. The chronology of the arrest and statement is as follows. Perry was arrested at approximately 11:35 a. m. on February 10, 1972. He was taken to the Police Administration Building, arriving at twelve noon. He was given the *Miranda* warnings and questioned concerning his involvement in the robbery and shooting. Almost immediately, without ever denying complicity, Perry began a narrative of the events leading up to the robbery beginning with the day before when he and Watson robbed another bar. His statement continued into the events leading up to his arrest the day following the shooting of Alexander. The statement was recorded in the interviewing officer's handwriting and was read and signed by Perry sometime between three and four p. m. on February 10th. Perry was further questioned until approximately 10:00 p. m.

and he was arraigned shortly after 11:00 p. m. on February 10th.

This Court, on several occasions, has said that the relevant time period to be considered in determining whether an unnecessary delay has occurred is the time between arrest and the making of the initial incriminating statements. *Commonwealth v. Rowe*, 459 Pa. 163, 327 A.2d 358 (1974). Here, there was no such unnecessary delay. Perry incriminated himself immediately upon being questioned and the recorded statement which he signed between three and four hours after arriving at the Police Administration Building merely repeated what he said earlier.

Second, Perry alleges that his statement should be suppressed since the arresting officers were not acting on probable cause when he was arrested without a warrant. Probable cause exists if "the facts and circumstances which are within the knowledge of the officer at the time of arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Commonwealth v. Culmer*, 463 Pa. 189, 344 A.2d 487, 490 (1975). Here, since the arresting officer was directed to apprehend Perry, although he was fully informed of Watson's statement, the operative question is whether the officer who directed that the arrest be made had information sufficient to support a finding of probable cause. *Commonwealth v. Kenney*, 449 Pa. 562, 297 A.2d 794 (1972). Since the officer who directed the arrest had received information directly from Perry's co-felon implicating himself and Perry, that officer indeed had probable cause. *Commonwealth v. Kenney*, supra. Accordingly, this assignment is without merit.

Third, Perry contends that the trial judge committed reversible error by expressing an opinion on the

degree of guilt in this case. In his charge to the jury on the question of voluntary manslaughter, the trial judge made this statement:

"That is not, *in my opinion, and I give it to you as my opinion,* that is not a proper verdict under the facts of this case. It seems to me that either you should find the defendant guilty or not guilty of murder of the first or second degree." [Emphasis supplied.]

Whatever merit this argument may have, it is not now before this Court. Perry made no objection either during the charge or at its completion.[2] The error, if this is error, has been, therefore, waived. Pa.R.Crim.P. 1119(b); *Commonwealth v. Raison,* 458 Pa. 378, 326 A. 2d 284 (1974); *Commonwealth v. Piper,* 458 Pa. 307, 328 A.2d 845 (1974).

Fourth, Perry contends that his right to a speedy trial was denied by a twenty-six month delay between arrest and trial. He bases his contention substantially on Pa.R.Crim.P. 1100. Although Perry was arrested on February 10, 1972 and was not tried until April 22, 1974, it is the date of a written complaint which controls the applicability of Rule 1100. Here, a written complaint was filed on February 12, 1972, well before the effective date of Rule 1100. Therefore, since Rule 1100 operates prospectively only, see *Commonwealth v. Roundtree,* 458 Pa. 351, 355, n. 6, 326 A.2d 285, 287, n. 6 (1974), Perry cannot claim its protection.

The facts of this case must then be examined in light of the standards in effect prior to the effective date of Rule 1100. These standards may be found in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101

---

2. At the completion of the charge to the jury, the trial judge called both counsel into his chambers and asked, "Is there anything on the law that the Court has missed or inadvertently failed to mention or incorrectly stated?" Defense counsel then raised two points not here relevant. No objection or comment was made concerning the point of voluntary manslaughter.

(1972); *Commonwealth v. Pearson,* 450 Pa. 467, 303 A. 2d 481 (1973), and *Commonwealth v. Hamilton,* 449 Pa. 297, 297 A.2d 127 (1972) and are, namely: the length of the delay; the reason for the delay; the defendant's assertion of his rights; and the prejudice to the defendant. Accordingly, an evaluation of each criterion is necessary.

A. Length of the delay

Perry was arrested on February 10, 1972 and tried on April 22, 1974, a delay of over twenty-six months. Such a delay is, at the least, enough to trigger an inquiry into the other factors.

B. Reason for the delay

The record reveals that defendant, or his counsel, filed several motions during the period between arrest and trial. First, a motion to suppress was filed on May 31, 1973. A hearing thereon was held on June 27–28, 1973. At the hearing, defense counsel requested leave to submit briefs. The suppression court granted the motion and took the motion to suppress under advisement, "briefs to be submitted." The motion to suppress was denied on October 9, 1973. On September 11, 1973, the defense filed two additional motions. One motion was for a change of venue and the second to suppress identification evidence. On November 16, 1973, one of the defendant's co-counsel moved to withdraw.

On January 14, 1974, Perry *pro se,* filed a motion for a pre-trial order enjoining the Commonwealth from cross-examining him or otherwise mentioning his prior criminal record.[3] Additionally, there are at least three re-

---

3. The Commonwealth, in its brief, as the assistant district attorney had done in a statement immediately preceding trial, makes much of a conference said to have taken place in the summer of 1973. At that conference, attended by Perry's counsel, Watson's counsel and the assistant district attorney who represented the Commonwealth at this trial, there is alleged to have been an agreement reached, prompted in part by Perry's attempt to negotiate a plea and the Commonwealth's desire to have Perry appear as a witness against Watson, which stipulated that Perry's trial was to be delayed pending the trial of Watson.

quests for continuances in the record, two signed by both the defense and the Commonwealth, one requested by the defense alone. Under these circumstances, it would be difficult to assign the fault for the delay to the Commonwealth. However, even if we were to assume, *arguendo*, that substantial periods of the delay were attributable to the Commonwealth, Perry's contention would fail for the reasons which follow.

## C. Assertion of his rights

It was not until April 2, 1974, less than three weeks prior to trial and at a time when the case had been assigned to the ready pool, that Perry first asserted his right to a speedy trial via a motion to dismiss indictments due to lack of prosecution. This motion was set down for disposition at trial. These facts cannot support a contention that the accused's demands to go to trial were refused.

## D. Prejudice to the defendant

Perry neither alleges nor shows that any prejudice accrued to him as a result of the delay. There are no allegations that valuable defense witnesses became unavailable or that the testimony of any witnesses was hampered by the effects of the passage of time. At trial, Perry presented no defense, but that circumstance was not alleged to have been occasioned by the delay. Therefore, we cannot find that Perry was denied his right to a speedy trial in the constitutional sense. *Commonwealth v. Pearson*, supra, *Commonwealth v. Hamilton*, supra.

Finally, Perry contends that a new trial is necessary since the trial judge, who was a mourner at the funeral of the deceased in the case at bar, refused to recuse. In response to an oral motion by defense counsel before the voir dire in this case, the trial judge made the following statement.

"Counsel, I think I should say for the record that I was present at the funeral of Detective Alexander.

That was brought to your attention by virtue of the fact that I told you that.

"I considered that concept not from a question of whether or not this Court could fairly conduct the proceedings of this defendant, but whether or not the imagery of justice, which is so valuable to all of us, would be anywise impaired by that consequence.

"The Court, after serious consideration of that question, is of the opinion that, number one, the imagery of justice is not impaired by that; number two, the question of whether or not I was acquainted with Detective Alexander—and that acquaintance was only that as a witness who had oftentimes appeared here in court—is totally irrelevant in the Court's mind to the question of the guilt or innocence of this defendant. And, like unto a juror, I can tell you the fact that I was familiar with, acquainted with or otherwise with Detective Alexander would have no bearing whatsoever upon the rights of the defendant here."

Initially, there do not seem to be any cases which deal with the necessity or desirability of a judge's recusal on the grounds that he was in some way acquainted with the deceased in a criminal case. However, we recognize that this case is controlled by the general principle that the trial judge should recuse himself whenever he has any doubt as to his ability to preside impartially in a criminal case or whenever he believes his impartiality can reasonably be questioned. See ABA Standards Relating to the Function of the Trial Judge, § 1.7, Circumstances Requiring Recusation. See also Canon 3(c), Code of Judicial Conduct.

 It has often been stated that a trial judge should avoid not only impropriety but also the appearance of impropriety. However, in the cases wherein the issue has been considered, the trial judge has had either a pecuniary interest in the controversy or a consanguineal

relationship with a party to the litigation. Here, our inquiry is limited to the question of whether a relationship between a judge and the victim of a crime, built upon the acquaintanceship of judge and witness, requires that the judge recuse himself when the alleged perpetrator of the crime is brought into that judge's courtroom for trial. We think that, under the circumstances of this case, there was no abuse of discretion on the part of the trial judge refusing to recuse.

In this case, there is an absence of the type of interest which would give rise to an appearance of impropriety much less to actual impropriety. First, the relationship involved here, that of an acquaintance, does not generate bias or prejudice against a defendant. Moreover, a great deal of difference exists between an acquaintance relationship and those situations which the law recognizes by their nature, carry at least the appearance of impropriety. See *Commonwealth v. Pavkovich,* 444 Pa. 530, 283 A.2d 295 (1971); *Commonwealth v. Snyder,* 443 Pa. 433, 275 A.2d 312 (1971); *In re Crawford's Estate,* 307 Pa. 102, 160 A. 585 (1932); *Davenport v. Meyer,* 4 Lebanon 185 (1953). Second, it would be an unworkable rule which demanded that a trial judge recuse whenever an acquaintenance was a party to or had an interest in a controversy. Such a rule ignores that judges throughout the Commonwealth know and are known by many people, some of whom may eventually be the victims of crime, and assumes that no judge can remain impartial when presiding in such a case. Therefore, the acquaintance between a judge and a victim of a crime, is not, in itself, sufficient to require the trial judge to recuse.

Therefore, since the relationship itself does not disqualify the judge, we look beyond the existence of this type of relationship to determine if any prejudice has actually accrued. After a close scrutiny of the record, it is clear that instantly the judge presided fairly and well

and the existence of any relationship between the judge and the victim had no effect on the performance of the trial judge.

Finally, one who asserts that a trial judge should be disqualified must produce some evidence of the necessity for that disqualification. See *Crawford's Estate,* supra; *Appeal of Askounes,* 144 Pa.Super. 293, 19 A.2d 846 (1941). This has not been shown in this case. Accordingly, there is no reasonable basis to question this judge's impartiality.

In sum, there is no violation instantly of either the Code of Judicial Conduct or the ABA Standards Relating to the Function of the Trial Judge. Further, the relationship in question is not one close enough in itself to raise a question concerning an appearance of impropriety. Finally, no actual prejudice to the defendant or evidence tending to show impropriety has been shown. Therefore, this contention is without merit.

Judgments of sentence affirmed.

ROBERTS, J., filed a dissenting opinion in which NIX and MANDERINO, JJ., join.

ROBERTS, Justice (dissenting).

We are presented with a simple question: May a trial judge be a mourner at the funeral of a police officer killed in the line of duty and then, over timely objection, sit in judgment of the person accused of the murder? The majority holds that he may. I dissent.

In my view, the trial judge's actions seriously threatened the appearance of justice, and, therefore, threatened both the public's and appellant's rights to an impartial trial. Moreover, the record establishes that appellant may have suffered actual prejudice when the trial court imposed sentence. Appellant's motion for recusal should have been granted.

A trial judge's duty to avoid the appearance of impropriety is an integral part of his judicial function. This is the universal teaching of cases, rules, standards and commentators. The United States Supreme Court has most often addressed the necessity of maintaining the appearance of acting justly, even in the absence of actual injustice, in the context of summary contempt cases. Thus, when holding that a trial judge should not himself try the case of a person who has hurled abuse at him in court, the Court stated:

> "In making this ultimate judgment, the inquiry must be not only whether there was actual bias on [the trial court's] part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.'"

*Taylor v. Hayes,* 418 U.S. 488, 501, 94 S.Ct. 2697, 2704, 41 L.Ed.2d 897 (1974), quoting *Ungar v. Sarafite,* 376 U.S. 575, 588, 84 S.Ct. 841, 849, 11 L.Ed.2d 921. See also *Mayberry v. Pennsylvania,* 400 U.S. 455, 465, 91 S. Ct. 499, 505, 27 L.Ed.2d 532 (1971); *Offut v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954); *Sacher v. United States,* 343 U.S. 1, 37, 72 S.Ct. 451, 468, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting opinion); ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge § 7.5 (Approved Draft, 1972).

The Pennsylvania Code of Judicial Conduct states:

## "CANON 2

A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities

A. A judge should . . . conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

## "CANON 3

. . . . . . . .

C(1). A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned."

The American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge § 1.7 (Approved Draft, 1972), states:

"The trial judge should recuse himself whenever he has any doubt to his ability to preside impartially in a criminal case or whenever he believes his impartiality can reasonably be questioned."

The commentary to this section explains:

"[T]he trial judge has an obligation to recuse himself whenever necessary to protect the right of the accused and of the public to an impartial trial. . . . The appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as would be the actual presence of bias or prejudice. . . .

"Some situations requiring recusation are obvious such as those involving relationships of consanguinity or affinity with the accused, the prosecuting witness, or other key figures in the trial. . . . More subtle and more difficult of resolution are those cases in which the connection between judge and other participants is remote and tenuous. Nothing more can be suggested by way of guidance then that there be a concerned interest in ascertaining whether the public impression will be favorable, even though the judge is convinced of his own impartiality." (Citations omitted.)

See *Commonwealth v. Goodman,* 454 Pa. 358, 361, 311 A.2d 652, 654 (1973).

Thus, a judge's duty to avoid the appearance of impropriety is crucial to our system of justice. As Lord Herschell stated at the turn of this century: "[I]mportant as it [is] that people should get justice, it [is] even more important that they should be made to feel and see that they [are] getting it." [1] This principle has been reiterated more recently by Professor MacKenzie: "[I]t is not enough that justice merely appear to be done; but the appearance of justice is an indispensible element of justice itself." [2] See *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1091–1092 (3rd Cir. 1976).

The majority apparently believes that the "appearance of justice" standard for recusal applies only when the judge has a familial relationship with one of the parties or a pecuniary interest in the outcome of the case. To the contrary, this Court has not hesitated, even in the absence of a familial or pecuniary relationship, to require a judge to disqualify himself to preserve the appearance of justice. We have done so even when the judge is shown not to be prejudiced. For example, in *Commonwealth ex rel. Allen v. Rundle*, 410 Pa. 599, 189 A.2d 261 (1963), decided over a decade ago, the judge at a post-conviction hearing had served as district attorney at the time of the petitioner's original trial. The record showed that peti-

---

1. 2 J. B. Atloy, Victorian Chancellors 460 (1908).

2. J. MacKenzie, The Appearance of Justice 241 (1974). Other commentators who have considered the issue uniformly advocate strict adherence to the "appearance of justice" standard. McKay, The Judiciary and Non-judicial Activities, 35 Law and Contemporary Problems 9 (1970); Orfield Recusation of Federal Judges, 17 Buffalo L.Rev. 799 (1968); Note, Disqualification of Judges for Bias in the Federal Courts, 79 Harv.L.Rev. 1435 (1966); Note, *Mitchell v. Sirica*: The Appearance of Justice, Recusal, and the Highly Publicized Trial, 61 Virg.L.Rev. 236 (1975). See also *Commonwealth Coating Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968) ("[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias."); *Cinderella Career and Finishing School, Inc. v. Federal Trade Commission*, 138 U.S.App.D.C. 152, 425 F.2d 583 (1970).

tioner had not suffered any prejudice from the judge's prior role:

"The hearing judge in this proceeding was the district attorney at the time the indictment was returned. In that capacity, he signed the bill of indictment and was responsible for the prosecution of the charge against the defendant-petitioner. Our examination of the record satisfies us that the failure of the hearing judge to disqualify himself from passing on this petition was in no way prejudicial to petitioner. The record is entirely free from even the slightest suggestion of prejudice or impropriety on his part."

410 Pa. at 600, 189 A.2d at 262. However, this Court unanimously held that the judge should have recused himself to preserve the appearance of justice even though his actual impartiality could not be questioned. We therefore remanded the case for a new hearing before another judge. Accord, *Commonwealth v. Young*, 439 Pa. 498, 269 A.2d 18 (1970). See also *Commonwealth v. Goodman*, supra.[3]

Here the trial judge attended the murder victim's funeral. There is nothing improper in his doing so. Judges,

---

**3.** In *Goodman*, the same judge presided at the suppression hearing and at trial. Prejudicial information, inadmissible at trial, was received at the suppression hearing. Appellant's request that the judge recuse himself at trial because of his exposure to the inadmissible evidence was refused. We stated that the request should have been granted. Appellant did not have to show that the judge was actually prejudiced by the inadmissible evidence. Relying on section 1.7 of the ABA Standards Relating to the Function of the Trial Judge, we stated:

"We have every confidence that the trial judges of this Commonwealth are sincere in their efforts to avoid consideration of incompetent inflammatory evidence in reaching their judgments but we also are acutely aware that the appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as would be the actual presence of either of these elements."

454 Pa. at 361, 311 A.2d at 654. Relief was denied, however, because appellant waived his claim when he failed to raise it on postverdict motions.

like other people, feel the need to express their grief in traditional ways. Attending a funeral is a deeply religious and reverent experience. A mourner necessarily becomes emotionally involved in the services. The life of the deceased is remembered and honored. This is particularly true here; the deceased was a police officer who had been killed in the line of duty. The emotional sense of bereavement which accompanies death by natural causes becomes more acute and intense when life is terminated by murder. In our society, reverence for life understandably evokes in mourners deep and keenly sensitive responses. To expect this profound emotional impact to dissipate quickly, particularly when it is recalled at the trial of the deceased's alleged murderer, is contrary to common experience.

Because the judge attended the funeral, he should have disqualified himself from the trial. Although he stated that he was not prejudiced toward appellant, his impartiality could reasonably be questioned. No other common pleas judge was reported to have been among the mourners at the funeral.[4] It is clear, therefore, that, given over eighty common pleas judges in Philadelphia, another judge who did not have even the appearance of bias was available.

This Court would not hesitate to hold that a mourner should not serve as a juror even if he were shown to feel no conscious prejudice toward the accused. The appearance of injustice and the likelihood of unconscious feelings of animosity are too great. Are not judges as much subject to human prejudice as other persons when exposed to emotional influence? If, therefore, it may be reasonably assumed that an ordinary individual attending a funeral would be moved to sorrow at a death, and anger against the murderer, may it not also be assumed that a judge would react the same way? These poten-

4. Philadelphia Bulletin, February 14, 1972.

tialities require that a judge who was also a mourner recuse himself upon request.

The judge's failure to disqualify himself violated the basic requirements of impartial judicial conduct. When circumstances reasonably raise doubts that influences from outside the courtroom are affecting his judgment, a judge should disqualify himself to preserve the appearance of justice. As stated in the commentary to Canon 2 of the Pennsylvania Code of Judicial Conduct:

> "A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly."

A diligent observance of impartiality in appearance as well as in fact enhances the perception of a judge's own scrupulous adherence to the principles of fairness. This in turn enhances the legitimacy and effectiveness of the judicial system.

Moreover, in this case, there is a distinct possibility that unconscious feelings influenced the judge's conduct. This is another reason why recusal is necessary when the judge has contact with a case outside his courtroom. As Justice Frankfurter stated, explaining his voluntary recusal in a case before the United States Supreme Court:

> "[R]eason cannot control the subconscious influence of feelings of which it is unaware. When there is ground for believing that such unconscious feelings may operate in the ultimate judgment, or may not unfairly lead others to believe they are operating, judges recuse themselves. They do not sit in judgment. They do this for a variety of reasons. The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact."

*Public Utilities Commission v. Pollak,* 343 U.S. 451, 466–67, 72 S.Ct. 813, 822–23, 96 L.Ed. 1068 (1952).

Finally, contrary to the majority's assertion, the record here indicates that there is a significant chance that the judge's personal feelings toward the victim influenced his conduct. Appellant was convicted of murder in the first degree, conspiracy, aggravated robbery and burglary. The jury imposed a sentence of life imprisonment on the murder conviction. The judge, at the sentencing hearing for the other crimes, imposed maximum sentences of ten to twenty years imprisonment for the robbery and burglary convictions. He directed that these sentences run consecutively to each other and to the life sentence. Thus, appellant is to serve twenty to forty years imprisonment after he serves his life sentence. These were the most severe penalties the judge could impose for these offenses. Because of the trial judge's contact with this case outside of the courtroom, his impartiality at the sentencing hearing could reasonably be questioned.

As we stated in *Goodman:*

"[W]e are . . . acutely aware that the appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as would be the actual presence of either of these elements."

454 Pa. at 361, 311 A.2d at 654. The continuing need to preserve and enhance the public's confidence in the impartiality and fairness of the judicial system is not advanced by ignoring the realities presented by this record.

I dissent.

NIX and MANDERINO, JJ., join in this dissenting opinion.