**UNITED STATES of America ex rel. Arthur PERRY, F–5241, Appellant,**

**v.**

**Julius T. CUYLER, Superintendent of Graterford State Prison, F. Emmett Fitzpatrick, District Attorney of Philadelphia, Appellees.**

**No. 77–2290.**

United States Court of Appeals, Third Circuit.

Argued July 24, 1978.
Decided Sept. 29, 1978.

Adams, Circuit Judge, dissented and filed opinion.

William T. Cannon, Philadelphia, Pa., for appellant.

Jane Cutler Greenspan, Asst. Dist. Atty., Michael F. Henry, Chief, Motions Div., Steven H. Goldblatt, Deputy Dist. Atty., Edward G. Rendell, Dist. Atty., Philadelphia, Pa., for appellees.

Before ADAMS, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Arthur Perry has appealed from the district court's denial of his petition for a writ of habeas corpus. Petitioner contends that he was deprived of his right under the Sixth and Fourteenth Amendments to a fair trial because the judge who presided at his trial had attended the funeral of petitioner's alleged murder victim. Although we share the dissent's concern that even the appearance of judicial bias be avoided, we do not believe that there was such an appearance of bias here as would deprive petitioner of his constitutional right to a fair and impartial trial. We will therefore affirm the order of the district court.

In affirming the judgment of the district court, we are mindful that our sole standard of review is whether there has been a "violation of the Constitution . . . of the United States." 28 U.S.C. § 2254(a). Thus we cannot exercise here the far broader supervisory powers that this court has over the federal district courts within our circuit. Under those supervisory powers, federal trial courts can be required to comport with standards far more rigorous than those set by the Constitution or by federal statute. *See McNabb v. U. S.*, 318 U.S. 322, 341, 63 S.Ct. 608, 87 L.Ed. 819 (1942); *U. S. v. Schiavo*, 504 F.2d 1, 7 (3d Cir.) (in banc), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974). In all due respect and despite the thoughtfulness of his opinion, we submit that the dissenting judge seeks to enforce a standard that would be appropriate only if this court had supervisory powers to set standards for state trial courts even in the absence of a constitutional violation.

I.

The Pennsylvania Supreme Court recited the events giving rise to this action as follows:

On February 9, 1972, two men entered the Choo-Choo Bar in Philadelphia. The first, later identified as the appellant Perry, ordered a beer and then left. Shortly thereafter, he returned and sat down toward the front of the bar. The second man, identified by the barmaid as Joseph Watson with whom the barmaid attended

school, entered through the side door armed with a shotgun. Watson announced that there was to be a robbery and the two men ordered all the patrons into the restrooms at the rear of the bar. One patron, Douglas Alexander, an off-duty police officer, waited for the other patrons to get to the rear of the bar, then drew his service revolver and shot Watson in the left thigh. Watson fired his weapon at Alexander and fatally wounded him. Perry helped Watson to leave the bar and the two then fled in a stolen automobile . . . [W]hen the police, who were looking for Watson from the personal identification given by the barmaid, questioned Watson in the hospital, he gave a statement which not only incriminated himself but implicated Perry and gave the police an address where he might be found. Patrolmen were radioed, told of the information received from Watson and directed to apprehend Perry.

*Commonwealth v. Perry*, 468 Pa. 515, 364 A.2d 312, 314 (1976). In April of 1974, two years and two months after his arrest, petitioner was tried in the Court of Common Pleas of Philadelphia County and convicted by a jury on charges of murder, conspiracy, aggravated robbery and burglary. The trial judge, James T. McDermott, informed petitioner's counsel prior to trial that he had attended the funeral of the detective. Counsel moved that Judge McDermott disqualify himself. Judge McDermott denied the motion. He stated that his acquaintance with the detective "was only that as a witness who had oftentimes appeared here in court" and that such acquaintance "is totally irrelevant in the Court's mind to the question of the guilt or innocence of this defendant." *Commonwealth v. Perry*, 364 A.2d 312, 317 (Pa.1976).

The Supreme Court of Pennsylvania denied petitioner's contention that Judge

McDermott's failure to recuse himself required the granting of a new trial. *Commonwealth v. Perry, supra.*[1] Petitioner then sought a writ of habeas corpus in the district court, the denial of which is the subject of this appeal.

## II.

Petitioner contends that actual prejudice is evidenced by the following actions of the trial judge:

1. Judge McDermott sentenced petitioner to life imprisonment on the murder count and from 10 to 20 years each on the robbery and burglary counts, the sentences to run consecutively.

2. Judge McDermott stated that although voluntary manslaughter was a possible verdict, in his opinion he did not believe it to be a proper one.

3. Judge McDermott refused, on one occasion, to meet with petitioner's counsel at side bar.

4. Judge McDermott asked several questions during the cross-examination of Petitioner (86–88a).

5. Judge McDermott made certain comments, during the jury charge, that allegedly bolstered the credibility of a key witness (66–68a).

6. Judge McDermott refused to sequester the homicide detective, Cecil Willis, who testified for the prosecution.

■ We have considered these contentions and have examined the relevant excerpts from the trial transcripts and we conclude that no actual prejudice has been shown on this record. Certainly, no individual act of the trial judge revealed a prejudice toward petitioner and we do not believe that such prejudice is observable even when these acts are considered in the aggregate.

---

1. Three justices dissented through the opinion of Justice Samuel Roberts. Though Justice Roberts cited several cases predicated on federal constitutional violations, he relies also on many Pennsylvania cases that were not bottomed on federal constitutional concepts, but, instead, were apparently predicated solely on the supervisory powers of the Pennsylvania

Supreme Court. *See Commonwealth v. Perry, supra*, 364 A.2d at 320, citing *Commonwealth ex rel. Allen v. Rundle*, 410 Pa. 599, 189 A.2d 261 (1963) (no reference made to federal constitutional principles). Justice Roberts also relied on the Pennsylvania Code of Judicial Conduct which, while of great significance, obviously does not set federal constitutional standards.

■ We recognize that even the probability of unfairness can result in a defendant's being deprived of his due process rights. *See In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Of course, such probabilities "cannot be defined with precision." *In re Murchison, supra*, 349 U.S. at 136, 75 S.Ct. 623. To determine whether the disqualification of a judge is necessary, we must examine, in the light of the particular circumstances, the substantiality of the interest of the particular judge in the outcome of the trial. We conclude that Judge McDermott's interest in the outcome of petitioner's case was not so substantial as to make unfairness so probable as to require disqualification.

■ Judge McDermott's acquaintance with the murder victim was not a close or personal one. He knew the detective only as a result of courtroom appearances. This acquaintance in and of itself would not indicate that Judge McDermott had a substantial interest in petitioner's conviction or sentence. Indeed, petitioner has not argued that this acquaintance alone would require disqualification.

The only factor in addition to this acquaintance is Judge McDermott's attendance at the victim's funeral. That funeral took place over two years before the trial. Justice Roberts, in his dissent to the Pennsylvania Supreme Court decision, commented on the "profound emotional impact" of a funeral on a mourner and the "deep and keenly sensitive responses" that are evoked.[2] Even if we accept his description of a mourner's feelings as basically accurate, we believe it takes too little cognizance of the temporal realities of this case where we are concerned with a time span of two years between Judge McDermott's attendance at the funeral and his presiding at petitioner's trial. If a judge's relationship with the victim of a crime is not such a close one as to require disqualification, we believe it unlikely that attendance at a funeral two years before would, by itself, result in such an increased level of emotional involvement as to make prejudice likely

and disqualification necessary. A judge's attendance might, in some instances, indicate the closeness of his relationship with the deceased. Here, however, the uncontradicted statement of Judge McDermott is that he knew the victim only as a result of courtroom appearances. It must be noted that, under these circumstances, the mere attendance at the funeral does not necessarily suggest an antagonism or bias towards the perpetrator of the act, but rather it is an expression of respect for a police officer killed in the line of duty. Finally, Judge McDermott was privy to no extra-judicial information concerning this petitioner. Thus, he had no reason, other than the evidence presented at trial, to believe that petitioner was guilty or innocent.

### III.

The cases in which defendants' rights were held to have been violated as a result of a probability of unfairness including those cited by the dissent, involve facts significantly different from those here. In *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), a defendant's conviction under the state prohibition act was overturned because, under the applicable local ordinance, the judge would only receive costs when he found the defendant guilty. It was this direct financial inducement to which the court referred in stating,

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

273 U.S. at 532, 47 S.Ct. at 444. *Cf. Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) (Arbitration award reversed, with citation to *Tumey*, because of appearance of impropriety arising out of financial dealings between an arbitrator and one of the parties).

2. *Commonwealth v. Perry, supra*, 364 A.2d at 320.

The Court, in *In re Murchison, supra,* confronted a situation where the judge who presided at a contempt hearing had previously served as the "one-man judge-grand jury" from which the contempt citation arose. The court stated, "Having been part of that [grand jury] process a judge cannot be, in the very nature of things, wholly disinterested in the conviction of acquittal of those accused. While he would not likely have all the zeal of a prosecutor, it can certainly not be said that he would have none of that zeal." 349 U.S. at 138, 75 S.Ct. at 625 (footnote omitted). Thus, the judge's bias or the appearance thereof was directed against the specific defendant. Another example of an appearance of impropriety is furnished by *Offutt v. U. S.,* 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954). There, the court held that, where a judge had cited a lawyer for contempt and had become "personally embroiled" with that lawyer, it was improper for that judge to preside over the hearing on the contempt charge.

The appearance of impropriety may also result where the judge has evidenced a bias directed against a class of which the defendant is a member. *See Berger v. U. S.,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (espionage convictions of German-American defendants overturned as result of trial judge's alleged anti-German-American remarks); *U. S. v. Thompson,* 483 F.2d 527 (3d Cir. 1973), (draft violator's conviction overturned because judge's alleged statement that he had a policy of ordering a standard sentence for all such violators evidenced a bias against the class of which defendant was a member).

In contrast to the above cases, Judge McDermott had neither a pecuniary interest in obtaining petitioner's conviction nor a personal bias against petitioner or any class of which petitioner is a member.

A more difficult argument is that once petitioner was convicted, Judge McDermott might have been prone to impose a harsher sentence as a result of the judge's relationship with the murder victim. We are, however, unpersuaded by this argument for the

reasons given above. Judge McDermott was only a casual acquaintance of the victim and he attended the funeral two years before he presided over the trial.

This circuit has demonstrated an intention not to require disqualification where there is no substantial probability of unfairness. In *U. S. v. Kravitz,* 303 F.2d 700 (3d Cir.), *cert. denied,* 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962), a defendant had pled guilty and then withdrawn his plea. He attacked his subsequent conviction arguing that the trial judge should have recused himself because the judge had seen defendant's presentence report, which contained prejudicial information, before the guilty plea was withdrawn. The court noted that no request that the judge disqualify himself had been made. The court continued:

> More fundamentally, the mere fact that a judge knows something to the discredit of an individual does not in itself disqualify him from presiding over a trial at which a jury is to determine that person's guilt or innocence of crime. If the judge conducts the trial fairly and properly and does not communicate what he knows about the accused to the jury, there is no rational basis for a claim that the judge's knowledge of facts discreditable to the accused and not in the record has made the trial fundamentally unfair. It often occurs in cases involving recidivists, in new trials and in other situations that a judge who has derogatory information about the accused, which is not and should not be submitted to the jury, properly presides at a jury trial.

303 F.2d at 701 (footnote omitted).

In *U. S. v. Myers,* 381 F.2d 814 (3d Cir. 1967), *cert. denied,* 390 U.S. 973, 88 S.Ct. 1065, 19 L.Ed.2d 1185 (1968), the defendant was charged with four separate acts of armed robbery. He pled guilty to three of these. A co-defendant with respect to these three counts had given a confession implicating the defendant. Defendant, after being convicted on the fourth count in a non-jury trial, argued that the judge should have disqualified himself because he had heard the confession implicating the de-

fendant on the other counts. The court rejected this argument stating, "We cannot presume that the trial judge was influenced by extraneous considerations in judging whether relator was guilty." 381 F.2d at 817. Also, *see In re Grand Jury Investigation*, 486 F.2d 1013 (3d Cir. 1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974) (a judge need not disqualify himself merely because the defendant had been investigated with respect to another matter while the judge had served as U.S. Attorney).

■ Here the potential bias was less than that in *Kravitz* or *Meyers* because Judge McDermott knew of no non-record information prejudicial to petitioner. Just as the court in *Kravitz* was mindful that judges often are aware of derogatory information concerning defendants over whose trials they preside, we must also be mindful that, especially in less populated areas, it is not unusual for a judge to preside over a criminal case where he has had some acquaintance with the victim. As previously discussed, that Judge McDermott went to the victim's funeral two years before does not make this case significantly different from such a case. The dissent stresses that "Since there were numerous other common pleas judges in Philadelphia who could have handled this case, no practical justification has been shown, even at this late date, for concluding that the appearance of injustice that arose in this case was not a sufficient reason for recusal." The implication of this reasoning is that if, in a rural county with only three state trial judges, a public offi-

cial was murdered and all three judges attended the funeral, then it would be constitutionally permissible for any of the three to preside at the trial of the alleged murderer; but, if only two judges attended the funeral, those judges would be disqualified as a matter of constitutional law. Lest the example seem fatuous, reference to the 1977–1978 Pennsylvania Legal Directory indicates that there is only one common pleas court judge in over twenty of the fifty-nine districts of Pennsylvania. Philadelphia should not be treated differently from Butler County when we apply constitutional standards to criminal proceedings. The existence *vel non* of the type of "practical justification" suggested by the dissent should not affect our decision here when we are deciding a constitutional issue. Instead we conclude that, on these facts, regardless of whether another judge unacquainted with the victim was available, the refusal of Judge McDermott to disqualify himself did not violate petitioner's constitutional rights. Upon considering the circumstances here in light of the case law, we conclude that the circumstances do not present the real probability of unfairness that would require disqualification or retrial.[3] Therefore, the judgment of the district court will be affirmed.[4]

ADAMS, Circuit Judge, dissenting.

The question here is whether, when a trial judge has been a mourner at the funeral of a police officer killed in the line of duty, the defendant who has been accused of the murder is denied a fair trial when

---

**3.** Petitioner's brief places heavy reliance on Judge MacKinnon's dissent in *Mitchell v. Sirica*, 163 U.S.App.D.C. 373, 502 F.2d 375, *cert. denied*, 418 U.S. 955, 94 S.Ct. 3232, 41 L.Ed.2d 1177 (1974). Without expressing a viewpoint on the merits of that case, we have no fundamental disagreement with Judge MacKinnon's analysis. We disagree, however, with the suggestion that such analysis requires the granting of the habeas writ in these circumstances. We also note that Judge MacKinnon relied on 28 U.S.C. §§ 144 and 455 and therefore had no need to face directly the constitutional claims raised by appellants in that case.

**4.** We have considered petitioner's other contentions listed below and conclude that they are without merit:

1) That petitioner's due process and equal protection rights were violated by the trial judge's expression of his personal opinion that petitioner should be found guilty or not guilty of first or second degree murder rather than being found guilty of voluntary manslaughter.

2) That petitioner's right to a speedy trial was violated.

3) That petitioner's right to the equal protection of the law was violated by the purely prospective application of Rule 1100 of the Pennsylvania Rules of Criminal Procedure.

the judge, over defendant's objection, presides at his trial and sentencing.[1] One of the fundamental canons of our jurisprudence is that a criminal trial must be free not just from demonstrative impropriety on the part of the judge, but also from the appearance of impropriety that leads to substantial doubt about the fairness of the proceedings. That standard, in my judgment, has not been met in this case.

In *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), the Supreme Court well expressed the deep-seated concern basic to our system of criminal procedure for maintaining the appearance of justice on the part of the trial judge:

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law.' *Tumey v. Ohio*, 273 U.S. 510, 532 [47 S.Ct. 437, 71 L.Ed. 749]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best

way 'justice must satisfy the appearance of justice.' *Offutt v. United States*, 348 U.S. 11, 14 [75 S.Ct. 11, 99 L.Ed. 11].

*Murchison* held that a state judge who had served as a "one-man grand jury" in the investigation of crime could not then try and convict a witness of contempt for events that had occurred before him in the grand jury proceedings. The Court cited the practical consideration that "it is difficult if not impossible for a judge to free himself from the influence of what took place in his 'grand-jury' secret session," when he tries the contempt case. *Id.* at 138, 75 S.Ct. at 626. More particularly, the Court stressed the likely effect of a *recollection* of the earlier proceedings at the time of the hearings on the contempt charge. Given that, there was said to be a danger—and certainly an appearance—that the judge could not fairly try the case.

The distinction between *Murchison*, on the one hand, and *United States v. Myers*, 381 F.2d 814 (3d Cir. 1967), *cert. denied*, 390 U.S. 973, 88 S.Ct. 1065, 19 L.Ed.2d 1185 (1968) and *United States v. Kravitz*, 303 F.2d 700 (3d Cir.) *cert. denied*, 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962), cases discussed by the majority, on the other hand, is a significant one. It is inevitable that in certain circumstances judges will become aware of material that does not ultimately become part of the record. For example, motions for suppression of confessions or other testimony require a judge to consider such material before he suppresses it. Our jurisprudential system must live with this risk of improper influence on judicial decisionmaking, because there is not alternative. *Murchison*, however, presented a situation in which the practical realities of the judicial process did not require that the

---

1. Defendant Perry was charged, *inter alia*, with murder, aggravated robbery, burglary and conspiracy. Prior to the selection of the jury, defendant's counsel made a motion for the recusal of the judge, based on the fact that the judge had been a mourner at the funeral of the deceased police officer whom the defendant was accused of killing. The trial judge declined to recuse himself, but set forth no reason for this ruling.

The defendant was convicted of the crimes charged, including murder in the first degree.

A penalty of life imprisonment was imposed for the murder conviction, and maximum sentences of ten to twenty years imprisonment for the robbery and burglary convictions. The trial judge directed that the last two sentences run consecutively to each other and to the life sentence on the murder conviction. He also directed a suspended sentence on the conspiracy conviction. Thus, the result of sentencing was that Perry must serve twenty to forty years in prison subsequent to his serving of a life sentence.

same judge both cite for contempt and try the case. In such circumstances, the Supreme Court held that the appearance of injustice required the judge to recuse himself.

As I view the facts of the present case, they are within the scope of the principle of *Murchison*. The trial judge attended the funeral of the murder victim, and did do so not as a part of his official duties or as a matter of protocol. By itself, there was of course no impropriety in the trial judge's attendance at the funeral. However, as Justice Roberts noted in his dissent when this case was appealed to the Pennsylvania Supreme Court, a mourner at a funeral "necessarily becomes emotionally involved in the services. . . . To expect this profound emotional impact to dissipate quickly, particularly when it is recalled at the trial of the deceased's alleged murderer, is contrary to common experience." *Commonwealth v. Perry*, 364 A.2d 312, 320–21 (Pa.1976) (Roberts, J., dissenting).[2]

Thus, the appearance of justice was brought into serious question and perhaps

**2.** Justice Roberts further elaborated on this point:

This Court would not hesitate to hold that a mourner should not serve as a juror even if he were shown to feel no conscious prejudice toward the accused. The appearance of injustice and the likelihood of unconscious feelings of animosity are too great. Are not judges as much subject to human prejudice as other persons when exposed to emotional influence? If, therefore, it may be reasonably assumed that an ordinary individual attending a funeral would be moved to sorrow at a death, and anger against the murderer, may it not also be assumed that a judge would react the same way? These potentialities require that a judge who was also a mourner recuse himself upon request.

*Commonwealth v. Perry, supra*, 364 A.2d at 321.

**3.** Petitioner Perry does not rely only on the argument that the appearance of justice has been unduly encroached upon by the action of the trial judge. In addition, he maintains that certain actions by the trial judge support his contention that the judge actually was biased against him. For example, he claims the judge expressed his personal opinion regarding the degree of Perry's guilt, and he expressed the view to the jury that a voluntary manslaughter verdict would be inappropriate.

undermined by the action of the trial judge who proceeded to preside over the case despite his prior action, the recollection of which would almost inevitably return—perhaps only unconsciously—during the trial of the accused.[3] *Cf. Commonwealth ex rel. Allen v. Rundle*, 189 A.2d 261, 262 (Pa.1963). The danger of such unconscious influence on a judge was captured in the words of Justice Frankfurter, writing in explanation of his voluntary recusal in a case before the United States Supreme Court:

[R]eason cannot control the subconscious influence of feelings of which it is unaware. When there is ground for believing that such unconscious feelings may operate in the ultimate judgment, or may not unfairly lead others to believe they are operating, judges recuse themselves. They do not sit in judgment. They do this for a variety of reasons. The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact.

*Public Utilities Commission v. Pollak*, 343 U.S. 451, 466–67, 72 S.Ct. 813, 822, 96 L.Ed. 1068 (1952).

Further, in his dissent to the opinion by the Pennsylvania Supreme Court, Justice Roberts stressed that "the record establishes that appellant may have suffered actual prejudice when the trial court imposed sentence," 364 A.2d at 318, for the sentences were "the most severe penalties the judge could impose for these offenses," *id.* at 322. I do not believe it necessary to find actual prejudice to conclude that the record here establishes the "possible temptation to the average man as a judge," *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927), that creates an appearance of injustice, regardless of the trial judge's best efforts to avoid any actual bias. The majority, in my judgment, has justified its result primarily on a conclusion that there was no substantial probability of actual prejudice when the more pressing concern is that there be no appearance of prejudice, however confident we may feel about the ultimate result. Appellant's evocation of Lord Herschell's comment to Sir George Jessel is apt: "Important as it [is] that people should get justice, it [is] even more important that they should be made to feel and see that they were getting it." 2 J. B. Atlay, Victorian Chancellors 460 (1908), *quoted in* Appellant's Brief at 2. *See Poteet v. Fauver*, 517 F.2d 393, 397 (3d Cir. 1975).

The conclusion I espouse is limited to the facts here: where a judge has attended the funeral of a murder victim who had been known to him, then presides over the trial of the accused murderer, despite a specific request made before trial that he recuse himself, and in the absence of any explanation for not calling in another judge. Since there were numerous other common pleas judges in Philadelphia who could have handled the case, no practical justification has been shown, even at this late date, for concluding that the appearance of injustice that arose in this case was not a sufficient reason for recusal.[4] Indeed, based on the record I believe it was, and so I respectfully dissent.

4. I cannot agree with the majority that practical considerations should not affect the evaluation of this appeal. If no alternative exists to continuing on as a judge in a case where some possibility for prejudice exists, that course of action may be justifiable. Where the possibility of bias is as readily avoidable as it apparently was here, the justification for a refusal to recuse becomes far more doubtful. The hypothetical situations envisioned by the majority do not minimize this point. In the event that every member of a particular trial court might be thought to be biased in a given case, it would be appropriate for counsel to request that an outside judge be brought in to hear the case. This practice is not particularly uncommon in Pennsylvania, nor has there been any suggestion that it creates undue inconvenience.

At the very least it would be hoped that a judge would state reasons for refusing to recuse when a possibility of bias arises, in order that such practical considerations and circumstances may be weighed. Moreover, a judge's refusal to explain his denial of a motion to recuse may itself contribute to an appearance of judicial bias.