## Slough v. City of Philadelphia

*Wayne R. Maynard,* for plaintiff.
*Craig E. Alston,* for defendant Commonwealth.
*Janet Seldon,* for defendant PennDOT.

CAESAR, *J.,* February 21, 1996—

# I. INTRODUCTION

This case presents the next chapter in issues raised in *Hubbard v. PennDOT and City of Philadelphia,* 660 A.2d 201 (Pa. Commw. 1995).

In *Hubbard,* the Commonwealth Court decided that a concrete structure or island in the middle of Spring Garden Street between 18th and 19th Streets in Philadelphia was not a "curb" and was part of the highway. That City street was taken over by the Commonwealth of Pennsylvania pursuant to various statutes. In the *Hubbard* opinion, the court declined to consider the issue of whether the Commonwealth was relieved of responsibility because the structure was a device for regulating traffic, since that issue was not raised in post-trial motions or in the Commonwealth's brief. *Id.* at 203 n.1.

In the present case, a principal issue is whether a concrete structure in the center of Bustleton Avenue, north of its intersection with Philmont Avenue in Philadelphia, is a device for regulating traffic. If so, the Commonwealth would not be responsible for its maintenance (repair). If the concrete structure is part of the highway itself (or at least the surface and base of the highway), then the Commonwealth would be responsible for its maintenance. Presumably, if the Commonwealth is not liable, the City of Philadelphia would be responsible.

In the interest of judicial economy, the parties agreed to waive a jury and go to trial on certain stipulations plus live testimony. It was agreed that in the event a finding was made in favor of the plaintiff and against the Commonwealth, the sum of $18,000, previously awarded by the arbitrators, was a fair and reasonable assessment of damages. It was also agreed that the

plaintiff did not incur medical expenses in excess of $1,500 nor did she suffer a permanent impairment of a bodily function. Therefore, if a finding were made against the City, plaintiff's claim would be limited to wage loss. Finally, it was agreed that if the plaintiff were to testify, she would testify in accordance with an offer of proof made by her attorney. However, she was examined on issues relating to loss of earnings.

This court denied motions for nonsuit by both the Commonwealth of Pennsylvania and the Pennsylvania Department of Transportation and the City. Thereafter PennDOT called Werner Eichorn, an employee whose current responsibility was safety and traffic in the highway district. PennDOT also called Joseph Nowakowski, another employee who had been responsible for maintenance of the highway at Bustleton and Philmont Avenues on or before the day the plaintiff was injured at that location. The City presented no witnesses.

As a result of the stipulations, testimony and exhibits the court makes the following findings of fact.

## II. FINDINGS OF FACT

(1) (a) On October 11, 1991 at approximately 8:30 p.m., plaintiff, *Connie Slough,* was caused to fall by a defective condition of concrete paving of a certain structure or island in Bustleton Avenue, immediately north of the intersection with Philmont Avenue in Philadelphia, Pennsylvania.

(b) At the time of the accident plaintiff had disembarked a southbound bus taking her home from work and was crossing Bustleton Avenue by foot.

(c) As a direct result of said fall plaintiff suffered a fracture of her right shoulder.

(d) As a direct result of said fall and fracture, plaintiff lost approximately 11 months of employment.

(i) On October 11, 1991 plaintiff had been employed for 13 months as a clerk in a bakery, where she worked, on average, 20 hours per week at $5 per hour.

(ii) In December of 1991, plaintiff attempted to return to her job but was unable to perform the required duties and was forced to take further leave after approximately three weeks.

(iii) In April of 1992, plaintiff took a job with Caldor, a retail establishment, but was physically unable to do the work and left after approximately one week.

(iv) In December of 1992 plaintiff took a regular job as a cashier.

(2) (a) The concrete structure in question was constructed under plans put forth by PennDOT in 1973 and 1974. The dates of construction were not testified to.

(b) There was no evidence that PennDOT did any maintenance of the highway at this location. The City presented no evidence whatsoever.

(c) The structure in question was laid over what was described as the crushed stone sub-base of Bustleton Avenue. It was designed as a "traffic island"—for the purposes of dividing or separating north and southbound lanes of traffic, to channelize or guide northbound motorists into a left-turn lane and as a pedestrian refuge. (N.T. 54-56, 66-67; exhibit CW-5.)

As designed, the structure was to have a sign advising southbound motorists to "KEEP RIGHT," and another advising northbound motorists the "LEFT LANE MUST TURN LEFT." Neither of these signs, nor their supports,

were present on October 11, 1991, though a hole was apparent in the concrete at the location where the northernmost (closest to Philmont Avenue) sign would have been located.

(3) The agreement between PennDOT and the City, entered into in 1971, specified that the respective duties of PennDOT and the City with respect to maintenance was "as provided by law." (Exhibit D CW-3, para. 12.)

(4) The defective condition of the structure on October 11, 1991 was such that, had a reasonable inspection been made by a responsible party, it would have been apparent that the defect existed and that it had existed for a substantial period of time prior to that date. (Exhibits P-1 to P-4.)

(5) The issue of responsibility for structures such as that present in this case had been before the City and the State since before 1986. The City has been on notice since March 26, 1986 that PennDOT believed it had no responsibility for such structures ("traffic islands"). (Exhibits D, CW-4.) There was no evidence of any response by the City. (See also, the opinion of Hill, J. in *Hubbard,* C.P., Phila., August Term, 1988, No. 3694 at findings of fact no. 12, p. 249, attached)

(6) The uncontradicted testimony of PennDOT witness Kowalsky was that the "base course" of a highway consists of "a layer of concrete that may be, for example, ten inches thick" lying on top of the stone sub-base, and covered with a surface course of bituminous blacktop. (N.T. at 130-31.) The further testimony was that the concrete structure in question here lay on top of the stone sub-base. It did extend several inches above the surface.

## III. ANALYSIS

The issues presented are:

(1) Was the structure a device for the purpose of regulating traffic, and

(2) Was it a part of the base and/or surface course.

### A. *The Governing Statute*

Bustleton Avenue at this location was taken over by PennDOT in 1961, pursuant to State Highway Act of 1961, Act of September 18, 1961, P.L. 1389; 36 P.S. §1758-101 et seq. It provided, in section 203, as follows:

*"Section 1758-203. Duties, obligations, authority of state, cities.*

"This act is not intended and shall not be construed:

"(1) To place upon the Commonwealth any duty to regulate traffic or police the streets herein taken over by the Commonwealth but such duty shall be and remain the obligation of the cities.

"(2) To place upon the Commonwealth any obligation for the maintenance, construction, reconstruction or re-surfacing of said streets other than the base or surface courses. . . .

"(4) To place upon the Department of Highways any authority to regulate traffic, parking or the general use by the traveling public of the streets or sections thereof taken over by this Commonwealth for maintenance or improvement under the provisions of this act. . . .

*"Section 1758-204. Maintenance and construction; costs, sharing.*

"After the streets described in section 202 of this act shall have been taken over by the Commonwealth they shall be maintained, constructed, reconstructed and

resurfaced by the Department of Highways at the expense of the Commonwealth . . . The obligation of the Commonwealth in the reconstruction, resurfacing or maintenance as hereinbefore provided shall be limited to that part of the street or section thereof between curb lines as established at the time of passage of this act, but shall not include the portions of such streets which are or may be used and occupied by the structures or surface facilities of any public utility company. . . ."

## B. *Traffic Device*

Is the structure in question (the "traffic island") a device for the regulation of traffic?

The testimony, the Pennsylvania Code (67 Pa. Code §211.1), and the United States Department of Transportation Manual on Uniform Traffic Control Devices all lead to the conclusion that the structure was a traffic control island (also called a "median" in *Hubbard).* As such, its purpose was to regulate traffic on Bustleton Avenue.

The regulations of PennDOT, codified at 69 Pa. Code §211.1, et seq., define an island:

"Section 211.4(b) *Island*—An area within a roadway from which vehicular traffic is intended to be excluded for the purpose of controlling and directing specific movements of traffic to definite channels."

Excerpts of the Manual on Uniform Traffic Control Devices, 1988 Edition, was offered as Exhibit D CW-2. It fully describes islands. Since the structure in question was designed for the purpose of, and actually does, regulate traffic, the City of Philadelphia has a duty to the public lawfully on the highway, including pedestrians, to use due care in maintaining the structure.

## C. *Part of the Highway*

The Vehicle Code, 75 Pa.C.S. §102, contains the following definitions:

" 'Highway.' The entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel. . . .

" 'Roadway.' That portion of a highway improved, designed or ordinarily used for vehicular travel, exclusive of the sidewalk, berm or shoulder . . ." See also, 67 Pa. Code §211.1.

The structure in question, then, is part of the highway and roadway of Bustleton Avenue. (This is consistent with the determination of the Commonwealth Court in *Hubbard.)*

By the testimony of the Commonwealth's witness, the structure goes through the surface and base courses of the highway and, as such, is part of that highway. PennDOT then, has a separate duty to those lawfully on the highway at Bustleton Avenue to maintain this traffic island.

## D. *Damages*

The City is liable to the plaintiff only for loss of earnings, which this court has determined to be $4,000.

PennDOT is liable for loss of earnings and pain and suffering, which the parties have agreed is a total of $18,000. Applying principles of comparative negligence, the court finds the comparative negligence of each of the defendants to be 50 percent. The City then, is liable to the plaintiff in the amount of $2,000 (50 percent of $4,000) and PennDOT is liable for the balance ($18,000, less the City's share, $2,000, or $16,000).

Accordingly the court enters the following order:

## ORDER

And now, February 21, 1996, the court:
(1) Finds the defendants, *City of Philadelphia,* and *Commonwealth of Pennsylvania, Department of Transportation* to be jointly liable to the plaintiff *Connie Slough;*
(2) Assesses damages as follows:

| | |
|---|---|
| Loss of earnings | $ 4,000 |
| Pain and suffering | 14,000 |
| *TOTAL* | $18,000 |

(3) Allocates comparative negligence as follows:

| | |
|---|---|
| PennDOT | 50 percent |
| City of Philadelphia | 50 percent |
| *Total* | 100 percent |

4. Awards the plaintiff
$ 2,000 due from City of Philadelphia
$16,000 due from PennDOT.

---

## APPENDIX A

### COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

CIVIL TRIAL DIVISION

AUGUST TERM, 1988—NO. 3694

NAOMI L. HUBBARD and
OLIVER HUBBARD, H/W
V.
COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF TRANSPORTATION and
CITY OF PHILADELPHIA

## ORDER

And now, April 20, 1994, the post-trial motion of defendant Commonwealth of Pennsylvania is denied, the jury verdict is molded in favor of plaintiff Naomi Hubbard and against defendant Commonwealth of Pennsylvania in the amount of $25,500 in addition to delay damages of $10,047.21. Judgment is hereby entered in favor of plaintiff Naomi Hubbard in the amount of $35,547.21 and against defendant Commonwealth of Pennsylvania.

Judgment is entered in favor of defendant City of Philadelphia and against plaintiff Naomi Hubbard.

See attached opinion.

> BY THE COURT:
> /s/LOUIS G. HILL

---

## I. PROCEDURAL HISTORY AND OVERVIEW

Plaintiff brought this action to recover for injuries sustained on December 16, 1987 when she fell on or near the raised edge of a traffic island in the 1800 block of Spring Garden Street, Philadelphia. The basic issue with regard to liability concerned whether the Commonwealth of Pennsylvania or the City of Philadelphia owned, controlled or maintained the area where the fall occurred. In order to permit a judicial determination on this question, the trial was bifurcated. Following a decision by the court that the Commonwealth, not the City, was responsible for conditions in the area in question, the case was submitted to a jury to apportion

the negligence between the Commonwealth and plaintiff and assess the damages.[1]

The question for the court concerning whether the Commonwealth or the City was liable for the condition of the area where plaintiff fell was a legal matter. In 1937 Spring Garden Street was taken over by the Commonwealth as a state highway but the statute, amendments and subsequent statutes required careful analysis in order to determine whether the Commonwealth or the City had the responsibility for maintaining the traffic island.

Due to insufficient evidence, the court was unable to make a determination as to which entity had actually maintained the traffic island in the past. After a review of the applicable statutes and amendments thereto, the court found that the Commonwealth was responsible for maintaining the area.

Thereafter, the jury attributed 51 percent of the causal negligence to the Commonwealth and 49 percent to plaintiff. The jury found damages in the amount of $50,000 which the court molded to $25,500.

## II. FINDINGS OF FACT MADE BY COURT BASED ON NONJURY SEGMENT OF BIFURCATED TRIAL

(1) On December 16, 1987, at approximately 6 p.m., plaintiff crossed from the north side of Spring Garden Street toward the south side between 18th and 19th Streets.

---

1. The notes of testimony were only transcribed for the first non-jury segment of the bifurcated trial since the issues involved in the post-trial motions do not concern the second phase of the trial before the jury.

(2) There is a median strip or traffic island in the middle of Spring Garden Street between 18th and 19th Streets.

(3) Naomi Hubbard fell and fractured her ankle when she stepped on the uneven outer edge of the north side of the median.

(4) A number of individuals, including engineers from PennDOT and the City, testified that the site of plaintiff's fall, depicted with an "X" on exhibit P-1, was a "curb" or "curbing." (Vol. I, 34, 74, 111; Vol. II, 156, 172, 207, 215.) The court declines to adopt these characterizations since the definitions of curb and curbing are legal determinations.

(5) The evidence during the liability phase of the trial was inconclusive concerning the identity of any party which had performed work in the general area in the past. The following are examples of this:

"(a) Exhibit P-3, an excerpt from a PennDOT book, contains a completion date of September 26, 1986 for repair of a ditch on the island at the 'SWC section of median @ Broad Street & 1731 WB' but fails to specify the name of the entity which actually did the work. (Vol. I, 45, 47, 48; ex. P-3.)

"(b) Exhibit P-4, a PennDOT complaint form, dated July 29, 1986, notes 'Utility Restorations: Spring Garden St. @ 1731 W/B' and 'SWC section of median at Broad Street' but again fails to document the name of the entity or party which worked on the ditches. (Vol. I, 49, 51, 53; ex. P-4.)

"(c) Defects on median strips on state highways are reported by PennDOT but the information is then forwarded to the party responsible for repair. (Vol. I, 45, 52, 76.) The court finds that exhibits P-3 and P-4 are not sufficiently probative on the issue of whether the

Commonwealth or the City had the responsibility for maintaining the traffic island.

"(d) Furthermore, utility companies are responsible for restoring holes which they make in median strips (Vol. I, 131) and the complaints referred to in FF no. 5(a) and FF no. 5(b) may have been directed to some utility company.

"(e) Exhibit P-5, a street line diagram for Spring Garden Street obtained from PennDOT, notes that Spring Garden Street from the north curb line to the south curb line is 80 feet but does not indicate the name of the entity responsible for the maintenance of traffic islands." (Vol. I, 55, 56, 57, 58, 69; ex. P-5.)

(6) Spring Garden Street has two separate roadways, one eastbound and the other westbound, divided by a median strip or island the purpose of which is to separate opposing streams of traffic.

(7) While there are two roadways, the court finds that Spring Garden Street is one highway.

(8) A divided highway, such as Spring Garden Street, includes whatever divides it..

(9) The purpose of the median strip or traffic island between 18th and 19th Street on Spring Garden is to serve as a barrier separating the traffic lanes. The court finds that a median strip or traffic island serves the same function as vertical barriers which commonly divide highways.

(10) A formal agreement does not exist between the City and the Commonwealth regarding the maintenance of medians on state highways.

(11) On March 24, 1986, PennDOT's chief counsel sent a letter to the solicitor of the City of Philadelphia outlining the Commonwealth's interpretation of various State Highway Laws and the Commonwealth's con-

clusion that the City of Philadelphia is responsible for maintaining traffic islands on state highways in the City of Philadelphia. The City did not respond to this letter.

(12) While the City is responsible for maintaining the traffic signals and street signs on state highways (Vol. II, 190), the court finds that the failure of the City to respond to PennDOT's March 14, 1986 letter was not an admission of responsibility.

(13) The median strip in question measures approximately four feet wide and was not designed for pedestrians to walk on longitudinally. The court finds that this median was not designed or constructed for the purpose of serving as a sidewalk.

(14) Although the Act of June 1, 1945, P.L. 1242 ("State Highway Law of 1945"), 36 P.S. §670-543, gives the Commonwealth authority to construct traffic islands, neither party was able to prove who actually built the traffic island in question.

## III. CONCLUSIONS OF LAW

### A. *Background Law*

(1) Spring Garden Street was adopted as a state-designated highway, Legislative Route 67030, pursuant to the State Highway Act of May 7, 1937, P.L. 589, the 1937 Act, which was amended by the State Highway Act of July 10, 1941, P.L. 345, the 1941 Act.

(2) The 1941 Act, which amended the 1937 Act, expanded the Commonwealth's obligations by deleting the following:

"(a) language which limited the Commonwealth's obligation for maintenance to 'the base or surface courses,' referred to in section 4(b) of the 1937 Act.

"(b) language which exempted the Commonwealth from maintenance of 'any structure of any kind or character, whatsoever situate, upon or forming part of any city street,' referred to in section 4(c) of the 1937 Act.

"(c) language which limited the Commonwealth's maintenance responsibilities to parts of the street 'between curb lines,' referred to in section 5 of the 1937 Act.

"(d) language which limited maintenance to '. . . portions of the street between existing curb lines available to vehicular traffic,' referred to in section 6 of the 1937 Act."

(3) Parts of the State Highway Law of 1945 specifically apply to streets in first and second class cities, see heading (d) immediately preceding 36 P.S. §670-541; Philadelphia is the only first class city in Pennsylvania. The sections of the State Highway Law of 1945 which are relevant to portions of the following analysis are contained in 36 P.S. §670-541 titled "Restrictions and limitations upon powers and obligations of state," 36 P.S. §670-542 titled in part "Construction, resurfacing, repair and maintenance;" and 36 P.S. §670-543 titled "Type of improvement."

## B. *Analysis*

(4) The 1941 Act states in section 1 that it is "an act providing *for the taking over by the Commonwealth under certain terms, conditions and limitations* of certain streets in cities of the first class as state highways . . . . " (emphasis added) The Vehicle Code, 75 Pa.C.S. §102, defines highway as "[t]he entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel." The above quoted language of the 1941 Act taken in conjunction with

the broad definition of highway in the Vehicle Code indicates that the Commonwealth is responsible for the entire width of the highway, including the median, unless clearly exempted by specific terms, conditions and limitations of the 1941 Act. See *Ruch v. City of Philadelphia,* 138 Pa. Commw. 68, 73, 587 A.2d 830, 832 (1991). In *Ruch* the Commonwealth Court quoted language from *Cheltenham Township v. Philadelphia Rapid Transit Co.,* 292 Pa. 384, 141 A. 259 (1928), where the Supreme Court of Pennsylvania stated that the Commonwealth "has single and supreme control over all and every part of a state highway which it has taken over in pursuance of the State Highway Laws." *Id.* at 388-89, 141 A. at 260-61.

(5) The 1941 Act states in relevant part in section 4(a) that "[t]his Act is not intended and shall not be construed to place upon the Commonwealth any duty to regulate traffic . . . but such duty shall be and remain the obligation of the cities."

(6) 67 Pa. Code §441.1 defines median as "any structure or area which separates the paved traveled ways for opposing directions of traffic."

(7) While the City is responsible for traffic regulation devices such as stop signs and traffic lights, the primary purpose of the median is not to regulate traffic but to separate the eastbound and westbound lanes of traffic. This purpose is one of traffic channelization rather than traffic regulation.

(8) The State Highway Act of 1945 repeats the language of the 1941 Act that the Commonwealth does not have any duty to regulate traffic, 36 P.S. §670-541(1), and adds language not present in prior acts which states that highway acts "shall not be construed . . . [t]o

place upon the department any authority to regulate traffic . . ." 36 P.S. §670-541(2).

(9) The general assembly included the construction of traffic islands as a type of improvement which the Commonwealth is permitted to make, 36 P.S. §670-543.

(10) The Statutory Construction Act of 1972 states that "[e]very statute shall be construed, if possible, to give effect to all its provisions," 1 Pa.C.S. §1921. In order to give effect to both 36 P.S. §670-541, which details the restrictions and limitations upon the powers and obligations of the state and 36 P.S. §670-543, which details the type of improvement the state is permitted to make, the construction of traffic islands cannot be considered a violation of the limitations on the Commonwealth's duty or authority to regulate traffic. If the construction of traffic islands is not a traffic regulation device, it follows that the island itself and its maintenance are not part of traffic regulation.

(11) The 1941 Act specifically addresses maintenance as follows in section 5: "After the streets described in section two of this act shall have been taken over by the Commonwealth, they shall be maintained . . . by the Department of Highways at the expense of the Commonwealth . . . ." The only limitation placed upon this clear language is the following: "Provided, *however, That nothing in this section shall be construed to place upon the Commonwealth any obligation to repair and maintain the curbing and footways of any such street.*" *Id.* (emphasis supplied) The State Highway Law of 1945 repeats this language, 36 P.S. §670-542.

(12) Curbing and footways are not defined by either the 1941 Act or the State Highway Law of 1945. When a statute does not define a key phrase, courts must

apply rules of statutory construction to discern meaning. *Browning-Ferris v. Department of Environmental Resources,* 143 Pa.Commw. 251, 257, 598 A.2d 1061, 1064 (1991). The Statutory Construction Act of 1972 states in relevant part that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage; . . . ," 1 Pa.C.S. §1903(a). See *e.g., Wajert v. State Ethics Commission,* 491 Pa. 255, 260, 420 A.2d 439, 441 (1980) (plain meaning of "establishment" obtained from Webster's New International Dictionary); *Township of Derry, Dauphin County v. Swartz,* 21 Pa.Commw. 587, 589, 346 A.2d 853, 855 (1975) (plain meaning of "places of amusement" determined after review of the definitions in current dictionaries).

(13) Footways is defined in Webster's Third New International Dictionary (1981) as "a footpath, sidewalk, or any way reserved for pedestrians." The Vehicle Code, 75 Pa.C.S. §102, defines sidewalk as "[t]hat portion of a street between curb lines, or the lateral lines of a roadway and the adjacent property lines, intended for use by pedestrians." Spring Garden Street is a divided highway which is defined by the Vehicle Code, 75 Pa.C.S. §102, as "a highway divided into two or more roadways and so constructed as to impede vehicular traffic between the roadways by providing an intervening space, physical barrier, or clearly indicated dividing section."

(14) The median functions as a physical barrier on the divided highway in order to separate opposing streams of traffic and not as a footway or sidewalk for pedestrians. It is obvious that medians were not constructed for the use of pedestrians. The median is

approximately four feet wide and is situated in the middle of a heavily traveled highway. The fact that someone might cross in the middle of the street and use the crosswalk as a refuge does not convert it from a physical barrier into a footway.

(15) The Department of Transportation's own regulation, 67 Pa.Code §211.1 defines a curb line as "the boundary between a roadway and a sidewalk, usually marked by a curb." Webster's Third New International Dictionary (1981) also defines a curb line as "the boundary between a roadway and a sidewalk area." Furthermore, a roadway is defined in the Vehicle Code, 75 Pa.C.S. §102 as "that portion of a highway improved, designed or ordinarily used for vehicular travel, exclusive of the sidewalk or shoulder."

(16) Accordingly, the north curb line of Spring Garden Street defines the edge of the westbound roadway and acts as a boundary between the westbound roadway and the adjoining sidewalk area. The median is the physical barrier on this divided highway which separates the eastbound and westbound roadways. Since a divided highway includes whatever divides it, Spring Garden Street includes the median. The south curb line of Spring Garden Street defines the edge of the eastbound roadway and acts as a boundary between the eastbound roadway and the adjoining sidewalk area.

(17) The Commonwealth makes much of the definition of the word "curb" as "a vertical or sloping member generally along and defining the edge of the roadway," 67 Pa.Code §211.1. However, this does not mean that the edge of the median strip is a curb simply because it is constructed of material which resembles curbing. If the two roadways were separated by a vertical barrier, such as a concrete barrier, a metal wall, or wooden

posts, it would not be possible to argue that the base of the vertical barrier was a curb. The function of the median strip is the same as a vertical barrier despite the fact that its dimension is horizontal. Traditionally, curbs are associated with parking, hydrants, sidewalks and buildings, none of which are involved with the edge of the median strip which the Commonwealth claims is a curb.

## C. *Recusal*

After considerable discussion which was not recorded on the record, the court attempted to sum up what it believed to be the law in the case prior to the taking of testimony. Starting at page 12, the following colloquy took place between the court and counsel for the Commonwealth:

"THE COURT: A curb is not defining the edge of the roadway here. The entire roadway is between the north side of Spring Garden Street and the south side of Spring Garden Street. That's a structure. It doesn't mean it's not still part of the highway.

"Furthermore, the curb line, the next definition below indicates it's a boundary between a roadway and a sidewalk, and the island is not a sidewalk.

"What it boils down to is the 1941 amendment hurts your case.

"MR. CALABRO: Is that your decision, judge?

"THE COURT: Pretty close to it unless you can show me why I'm wrong.

"MR. CALABRO: Well, no offense, but I would now make a motion to preclude you from hearing this case nonjury since you already made your determination before the—

"THE COURT: I haven't made my determination." (Vol. I, 12-13.)

The point is that there was a considerable discussion of the law (Vol. I, 14), which occupied an entire morning prior to the nonjury hearing on August 5, 1993. At that time, the court attempted to understand the case, read the statutes and since the matter was scheduled for a jury trial, discuss settlement without getting into any amounts. The court then recommended that it rule on whether the Commonwealth or the City was responsible for conditions in the area where plaintiff fell.

Counsel for the Commonwealth now accuses the court of making up its mind before the trial actually started. However, the court merely articulated what it believed the law to be based on its earlier review. The court did not get into the believability of witnesses, damages, negligence or the like. The fact that a court expresses its view of the law at the commencement of a trial is not a basis for recusal. This is particularly true where the court keeps an open mind and listens to an exhaustive argument on the subject.

The record will show that the court did not decide this matter until the end of the nonjury phase of the case. Although the court articulated what it believed the law to be, it clearly informed counsel that it would listen to what counsel had to say and would change any opinion it had if it became clear that the viewpoint of counsel for the Commonwealth was correct.

(18) The party seeking the disqualification of a trial judge bears the burden of producing evidence which has a tendency to show bias, prejudice or unfairness. *Reilly by Reilly v. SEPTA,* 507 Pa. 204, 220, 489 A.2d 1291, 1299 (1985); *Commonwealth v. Darush,* 501 Pa. 15, 21, 459 A.2d 727, 731 (1983); *Commonwealth v. Perry,* 468 Pa. 515, 526, 364 A.2d 312, 318 (1976);

*In re Crawford's Estate,* 307 Pa. 102, 109, 160 A. 585, 587 (1931).

(19) In the context of disqualifying a judge, "bias and prejudice refer to mental attitude or disposition of the judge toward a party to the litigation, and not to any views that he may entertain regarding the subject matter involved." 46 Am.Jur.2d *Judges* §167 (1969). See *e.g., In Interest of McFall,* 533 Pa. 24, 36, 617 A.2d 707, 713 (1992) (an environment of partiality toward the prosecution was created when presiding judge who faced potential prosecution was cooperating in self-interest with the same authorities who prosecuted defendants in her courtroom every day); *Commonwealth v. Knighton,* 490 Pa. 16, 23, 415 A.2d 9, 13 (1980) (trial judge whose family had been repeatedly threatened on the phone by the defendant and who believed that he could not fairly and impartially impose sentence should recuse himself from the case); *Commonwealth v. Lemanski, 365 Pa. Super. 332, 341, 529 A.2d 1085, 1089 (1987) (trial judge should have recused himself in light of allegations, supported by the record, of personal bias which indicated predetermined policy with respect to sentencing drug offenders).*

(20) The Commonwealth has failed to meet its burden of producing evidence that the court was biased or prejudiced toward any party in this case.

(21) The Commonwealth has failed its burden of producing evidence that the court acted unfairly in this case. The court heard argument before and after the nonjury trial and then decided a question of law. It is rarely possible to please both parties.

BY THE COURT:
/s/LOUIS G. HILL

# APPENDIX B

| Act of May 7, 1937, P.L. 589, No. 153 (Act 153) as amended by Act of July 10, 1941, P.L. 345, No. 141 (Act 141) [Applied in *Hubbard*] | State Highway Law, Act of June 1, 1945, P.L. 1242, 36 P.S. 670-101 et seq. [Codified Acts 153/141] [Applied in *Hubbard*] | State Highway Act of 1961, Act of September 18, 1961 P.L. 1389, 36 P.S. §1758 et seq. [Adopts Bustleton Avenue as Route 67322]. |
|---|---|---|
| §4. This act is not intended and shall not be construed: | §670-541 | |
| a) To place upon the Commonwealth any duty to regulate traffic or police the streets herein taken over by the Commonwealth, but such duty shall be and remain the obligation of the cities: | (1) same as §4(a) of 1937 Act | §203(1) same as 4(a) in 1937/1941 Acts. |
| (b) To place upon the Commonwealth any obligation for the maintenance, construction, reconstruction, or resurfacing of said streets other than the base or surface courses [eliminated by 1941 Act].<br>*** | | (2) reenacts §4(b) of 1937 Act. |
| (f) [renumbered (b) by 1941 Act] To place upon the Department of Highways any authority to regulate traffic, parking or the general use by the traveling public of the streets, or sections thereof, taken over by the Commonwealth for maintenance or improvement under the provisions of this act ... | (2) same as §4(f) of 1937/1941 Acts | (4) same as 4(f) of 1937/1941 Acts. |
| §5. After the streets described in section two of this act shall have been taken over by the Commonwealth, [and] resurfaced and repaired by the Department of Highways at the expense of the Commonwealth ... Provided, however, That nothing in this section shall be construed to place upon the Commonwealth any obligation to repair and maintain the curbing and footways of any such street. [Amended by 1941 Act] | §670-542 Same as §5 of 1937/1941 Acts. | Same as §5 of 1937/1941 Acts. |
| §16. The type of improvement shall include ... the construction of traffic islands, circle or other traffic channelizations ... street and traffic signs, traffic signals ... and such other work, ... as may be necessary fully and satisfactorily to complete such improvement.<br><br>[Added in 1941] [Codified at 36 P.S. §961-14]. | §670-543 Type of improvement The type of improvement shall include ... the construction of traffic islands, circle or other traffic channelizations, ... street and traffic signs, traffic signals ..., and such other work, ... as may be necessary fully and satisfactorily to complete such improvement. | |