J-A06002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER LEE SCHWENK | : | |
| | : | |
| Appellant | : | No. 1912 MDA 2017 |

Appeal from the Judgment of Sentence October 8, 2015
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0000656-2014

BEFORE: OTT, J., NICHOLS, J., and PELLEGRINI[*], J.

MEMORANDUM BY OTT, J.: **FILED AUGUST 06, 2019**

Christopher Lee Schwenk appeals from the judgment of sentence imposed on October 8, 2015, in the Court of Common Pleas of York County following his conviction by jury of third-degree murder.[1] The jury acquitted him of first-degree murder and voluntary manslaughter. Schwenk received a sentence of 20 to 40 years' incarceration. In this timely appeal, Schwenk raises four issues: (1) the trial judge erred in failing to recuse himself based on repeated conflicts with defense counsel; (2) the trial court erred in denying Schwenk's motion to suppress evidence as untimely; (3) the trial court erred in failing to preclude the statements of Roque Castro, a witness to the crime who did not testify at trial, as hearsay; and (4) the trial court erred in failing

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

to grant a new trial or dismissal based upon the insufficiency of the evidence. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

For a full recitation of the underlying facts of this matter, we refer to and incorporate pages 4 – 15 of the trial court's Pa.R.A.P. 1925(a) opinion, dated April 5, 2018. For ease of reference, we note the following.

In the early morning hours of November 6, 2013, Ashley Rodriguez got into an altercation with Eddie Gallon.[2] Schwenk, a current paramour of Rodriguez, came to her aid. Gallon left the scene but returned shortly thereafter and threw a rock through one of Rodriguez's mother's windows. Schwenk obtained Rodriguez's 9mm Smith and Wesson semi-automatic handgun, chased Gallon for a brief distance and fired seven shots at him. All the bullets missed the intended target, but one of them struck the victim, Monique Nixon, who died from the gunshot wound.

When the police arrived at the scene of the crime, Roque Castro informed them he witnessed a black male attempting to pick up shell casings before running into a nearby apartment. He also informed the police he heard an argument and glass breaking at that apartment prior to hearing gunshots.

The police recovered several 9mm shell casings from the crime scene. Detective First Class Jeffrey Spence was the detective supervisor for the crime

_____

[2] The nature of their relationship is not clear. Gallon testified he and Rodriguez were in an ongoing, though tumultuous, relationship while Rodriguez testified the relationship had ended sometime earlier.

- 2 -

and sought to enter the apartment indicated by Castro. Rodriquez answered the door and refused warrantless entry to the police. After 10 to 20 minutes passed, Detective Spence believed the situation had become unsafe. He then decided to, and did, enter the apartment without a warrant. Inside, Schwenk was found, naked on the bed. A 9mm Smith & Wesson semi-automatic weapon was also located near the bed. Subsequent forensic analysis determined the fatal bullet and the shell casings found at the crime scene were all fired by the handgun found in the Rodriguez apartment. Forensic analysis also determined Ashley Rodriguez's DNA was on the handgun, but Schwenk's DNA was not. However, Schwenk had gunshot residue on his hands, while Rodriguez did not.

Although all inhabitants of the apartment were taken into custody for questioning, only Schwenk was ultimately arrested. While in custody and awaiting trial, a jailhouse informant told the authorities Schwenk had admitted to the shooting, claimed to have had sex with Rodriguez after the shooting, and that Rodriguez had taken the handgun, wiped it off and hidden it in the bedroom, where it was ultimately found.

No witnesses to the surrounding events claimed to have seen Rodriguez pursue Gallon or shoot at him.

Schwenk's first claim is the trial judge erred in failing to recuse himself after a series of conflicts between the judge and defense counsel.[3] Initially, we note,

> Our standard of review of a trial court's determination not to recuse from hearing a case is exceptionally deferential. We recognize that our trial judges are "honorable, fair and competent," and although we employ an abuse of discretion standard, we do so recognizing that the judge himself is best qualified to gauge his ability to preside impartially. **Bonds**, 890 A.2d at 418 (*citing **Commonwealth v. Abu-Jamal**, 553 Pa. 485, 720 A.2d 79, 89 (1998)).
>
>> The party who asserts that a trial judge should recuse bears the burden of setting forth specific evidence of bias, prejudice, or unfairness. *See **Commonwealth v. Perry**, 468 Pa. 515, 364 A.2d 312, 318 (1976). "Furthermore, a decision by the trial court against whom the plea of prejudice is made will not be disturbed absent an abuse of discretion." **Commonwealth v. Buehl**, 540 Pa. 493, 658 A.2d 771, 782 (1995).
>
> **Commonwealth v. Stafford**, 749 A.2d 489, 501 (Pa. Super. 2000). *See also **Commonwealth v. Tedford**, 598 Pa. 639, 713, 960 A.2d 1, 55-56 (2008). ("[I]t is the burden of the party requesting recusal 'to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially.' ").

**Commonwealth v. Harris**, 979 A.2d 387, 391-92 (Pa. Super. 2009).

Although Appellant's brief mainly addresses confrontational encounters between defense counsel and the trial judge, the only request we can find for for recusal was made pre-trial resulting from the denial of a motion for

---

[3] The trial judge, the Honorable Thomas H. Kelley, retired in October, 2015, shortly after sentencing Schwenk. The Honorable Harry M. Ness was assigned to this case thereafter.

- 4 -

continuance. At the final pre-trial conference on July 16, 2015, the trial judge denied Schwenk's counsel's request for a continuance. Schwenk was not present in the courtroom. Trial counsel noted that Schwenk would be concerned regarding the trial judge's ability to be fair and impartial, a concern the trial judge found to be meritless. Nonetheless, trial counsel stated the recusal issue would be raised again prior to trial when Schwenk was present. On July 20, 2015, this exchange took place:

> [Defense Counsel]: Yes, Your Honor. Again, last week we had raised some motions, and Your Honor did deny them. I did explain what occurred to Mr. Schwenk. Mr. Schwenk is concerned about Your Honor's ability to be fair and impartial and act without animosity, even if it's towards Defense Counsel, and he does believe that that is going to prevent him from being or having a fair trial and exercising full due process, so he is asking Your Honor to recuse himself, yourself.
>
> I do have a case here which does speak to if there's even – first of all, if there is actual animosity, then there should be recusal, and even if there's a perception of it, then there should be recusal to affect the fair administration of justice as well as respect, maintaining the respect for the impartiality of the Courts. So I do have that case, I can pass up to Your Honor.
>
> THE COURT: Okay. Okay. All right, well, I'm aware of the case law. Under the circumstances – and I know that this matter was initially raised at the conclusion of last week's hearing, it was raised for the first time. When was an information filed in this case? I shouldn't say information, Complaint.
>
> [Prosecutor]: The formal arraignment was on March 3, 2014.
>
> THE COURT: Okay. Well, I note that it was raised last week for the first time. The formal arraignment was March of 2014, a year and four months ago. We've had a number of hearings, status conferences, et cetera.

I denied Counsel's request for a continuance in part. Well, I guess the request for the continuance was in toto, but I did conduct a hearing as to the basis for the continuance request. At the conclusion of that hearing was the first time that it [recusal] was raised by Defense Counsel, and that is not indicative of any animosity. It just simply means that I found that the request for continuance was patently without merit.

So motion to recuse is denied. The Court can be fair and impartial. The Court directs no animosity towards either Defense Counsel or the Defendant.

N.T. Vol. 1, 7/20-21/2015, at 5-7.

Although there are vague references to prior adverse rulings, the only issue brought before the trial court was the denial of a motion for continuance that was raised mere days before the trial was scheduled to start. After being asked to recuse, the trial court properly explained that an adverse ruling on the merits was not indicative of animosity and that the trial judge could be both fair and impartial. We have reviewed the certified record including the relevant notes of testimony and see no evidence that the trial court bore animosity to the defendant or defense counsel in the denial of the motion for continuance. Accordingly, there was no abuse of discretion in denying the motion for recusal.

On July 22, 2015, after contentious exchanges between the trial judge and defense counsel, a hearing was held in chambers during which defense counsel was told not to continually question the trial court's rulings in front of the jury. In doing so, the trial judge reminded defense counsel she had, in a prior trial, told the jury the trial judge had ruled incorrectly, and that such

behavior was inappropriate and would not be tolerated. The notes of testimony contain the following:

> THE COURT: […] for instance, yesterday, I told you twice that I had ruled. You continued to argue with me. You asked me to approach sidebar. I denied that request because my ruling was clear, it was unambiguous, and it was a solid ruling.
>
> You had asked the same question a multitude of times. I understand that you were dissatisfied with the answer, but that was the answer you got, okay. I think, to the extent possible, I clarified the issue for you, and you continued to argue with me, finally saying in front of the Jury, "Are you cutting me off?" I had ruled, and I had told you I had ruled. I asked you to move on, and you made the statement.
>
> You can't question my rulings. As soon as I've ruled, I've ruled. I have never ever experienced this before except with you. For instance, the time I told you I had ruled, you turned to the Jury and said I was wrong. You told the Jury after I advised them –
>
> [Defense Counsel]: Was this this trial or another trial?
>
> THE COURT: No, it's another trial, but I'm telling you as an example of my experience. You are not doing your client any service. You are to argue to me, not with me, okay. It's completely inappropriate, and you do not have the last word when I've ruled, okay. I have the last rule – word. I rule after I've heard argument from both sides, okay.
>
> And as I said, it doesn't do your client any service to have you engaging me rather than abiding by my rulings, okay, because ultimately I've told them, and I'm going to tell them again that I am the person who determines what the law is. So, in that capacity, when I rule, you have to abide by that, okay. The inference to the Jury is either, A, that I'm wrong, in which case you have the appellate process, or, B, that somehow there's something different than my determination, that being your determination, okay.

So as I told you yesterday, I had warned you concerning contempt. If, after I've ruled, you question one of my rulings, I will find you in contempt. We'll come back here and I'll make that determination, okay. There's no question in my mind. This isn't open to discussion.

[Defense Counsel]: So there's nothing I can say on the record you're saying?

THE COURT: That's not what I'm saying at all. I'm saying you can – here's how I do it. This is the accepted practice. You object or counsel for the Commonwealth objects. I ask for a response, okay, from either side, whomever the responding person is.

As soon as I've heard that, if I don't ask additional questions, I will tell you, as I did yesterday on two separate occasions within the same objection, I've ruled. As soon as I've ruled, I've ruled. Your opportunity to offer anything to me is when I say, response, or when I say, if you're objecting, basis for the objections, okay. We don't supplement things with ongoing arguments. You put forth your best argument and I rule, okay.

This is not – this is not Greek. This is readily apparent from how things work, how I was trained, how everyone else who goes to law school was trained, okay. If you have an issue with one of my rulings, you are to appeal my ruling to the Superior Court. That is your avenue for redress under the circumstances.

N.T. Trial, Vol. 2, 7/22/2015, at 3-6.

Further,

THE COURT: […] So you make your objections or you respond to your objections unless it's patently obvious from the record that something is objectionable. On a number of occasions yesterday, I didn't even ask the Commonwealth for a response to your objection to leading questions. The one instance was where I wanted to hone the issue in, and I said I'm going to allow it, okay. I don't need to hear argument on a leading question. I'm listening to the questioning and I'm listening to the responses, okay.

All I'm telling you is, when I rule, regardless, I've ruled. There's no question. There's no additional argument if I haven't asked for argument, okay. You can at any point in time respond or state the basis for an objection if you're objecting, okay.

Are there any questions from the Commonwealth?

[Prosecutor]: No, Your Honor.

[Defense Counsel]: Well, I just want to say on the record that this is actually why we asked you to recuse yourself because, again, you're bringing up some long other time at trial. I haven't been in trial in front of you in years.

THE COURT: No, I'm giving you an example.

[Defense Counsel]: If I can just state – finish. And, you know, when you do make your rulings, it's not just a neutral ruling. You know, you're gesturing, I mean, you're almost red in the face.

THE COURT: I'm going to deny that on the record. I'm not going to allow you to supplement this at all. You're testifying at this point.

[Defense Counsel]: I want to –

THE COURT: No, you are not going to – I'm telling you you're not going to supplement the record with your own testimony. The reason why I responded yesterday – or today with the example is because I needed to provide you an example with how that behavior is unacceptable, okay. I am referring to something before because it's an example, and I'm also referring to what occurred yesterday when you're questioning my ruling, including for instance, during voir dire. You asked a completely inappropriate question, and four people responded. You asked does anyone not wish to be here, and four people responded and raised their hand. I interrupted and said, that is not an appropriate question. It is not. It is obviously an inappropriate question, and, thereafter, you turned to the Jury and said, well, I usually get jokes out of that question. I don't need your editorial responses.

[Defense Counsel]: But, Your Honor, actually –

- 9 -

THE COURT: No, that's it. I've advised you. Katie [court reporter], we're off the record at this point.

*Id.* at 7-10.

The trial court appears to have accepted statement on July 22, 2015 ("this is actually why we asked you to recuse yourself") as a second formal request for recusal, based upon the trial court having commented on prior problems with Defense Counsel. Unfortunately, when denying the second request for recusal, the trial court did not affirmatively reassert the ability to remain fair and impartial and did not specifically deny animosity toward defense counsel or Schwenk. Nonetheless, the judge assigned to this matter following the retirement of the original trial judge accurately noted the certified record did not reflect improperly prejudicial actions taken by that judge during trial. The original trial judge ruled against Schwenk and the Commonwealth. We note that the trial judge may have exhibited frustration with defense counsel over the continuing refusal to accept rulings and move on, but such frustrations do not equate to the inability to preside over the trial in an impartial manner. Accordingly, Schwenk is not entitled to relief on this issue.

Next, Schwenk argues the trial court erred in failing to consider and rule upon his motion to suppress evidence based upon his claim the warrantless search of Rodriquez's home was illegal. It is important to note the trial court denied the motion on the purely procedural ground that it was untimely. Therefore,

The interpretation of procedural rules is a question of law, so our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Dowling***, 598 Pa. 611, 959 A.2d 910, 913 (2008).

The rules for interpreting a Rule of Criminal Procedure in this Court are well established:

> When we interpret our Rules of Criminal Procedure, we employ the same principles employed in the interpretation of statutes. Pa.R.Crim.P. 101(C); ***Commonwealth v. Cooper***, 611 Pa. 437, 27 A.3d 994, 1003 (2011). The object of interpretation of the criminal rules "is to ascertain and effectuate the intention" of our Supreme Court, as the rule-issuing body. "Every [rule] shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). "When the words of a [rule] are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b).

***Commonwealth v. Noel***, 53 A.3d 848, 855 (Pa. Super. 2012).

***Commonwealth v. Phillips***, 141 A.3d 512, 518 (Pa. Super. 2006).

It is undisputed that a motion to suppress evidence is subject to Pa.R.Crim.P. 578 and 579. Rule 578 states:

> Unless otherwise required in the interests of justice, all pretrial requests for relief shall be included in one omnibus motion.

Pa.R.Crim.P. 578. The comments to the rule specifically list a motion for suppression of evidence as being appropriate for inclusion in the omnibus pretrial motion.

Rule 579 states, in relevant part:

> Except as otherwise provided in these rules, the omnibus pretrial motion for relief shall be filed and served within 30 days after arraignment, unless opportunity therefor did not exist, or the defendant or defense attorney, or the attorney for the

Commonwealth, was not aware of the grounds for the motion, or unless the time for filing has been extended by the court for cause shown.

Pa.R.Crim.P. 579.

Schwenk was originally represented by different counsel than who tried his case. He was arraigned on March 3, 2014. Original counsel did not file an omnibus pre-trial motion. Original counsel was replaced by trial counsel on November 21, 2014. Trial counsel ultimately filed an omnibus pre-trial motion, including the suppression issue, on December 22, 2014, more than eight months late. However, the trial court refused to consider the motion due to its untimely filing.

The rule is clear, unless the opportunity to file the motion did not exist or the grounds for the motion were unknown, a motion for suppression of evidence SHALL be filed within 30 days of arraignment. There is nothing in the certified record indicating that there existed no opportunity to file the motion or that the alleged grounds for relief were unknown, nor does appellate counsel make such claim. While the trial court could have entertained the motion in the interests of justice, there is no requirement that the court do so. Accordingly, having followed the rule, the trial court did not err in refusing to hear the motion to suppress,[4] and Schwenk is not entitled to relief on this issue.

---

[4] Appellate counsel concedes in Schwenk's brief that this issue may be properly pursued in the context of a PCRA petition. Schwenk's Brief at 23.

In his third claim, Schwenk argues the trial court erred in failing to suppress the statements of Roque Castro as inadmissible hearsay. This claim is meritless.

Under the Pennsylvania Rules of Evidence, hearsay is defined as:

> [A] statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Pa.R.E. 801.

Several witnesses from the police department testified that Roque Castro informed them he witnessed a black male attempting to pick up shell casings from the street and that the person had run into a specific apartment. This information led the police to Rodriguez's apartment where Schwenk was ultimately located. When this testimony was offered, counsel dutifully objected to its admission as hearsay. Each time, the Commonwealth responded that the information was not being offered for the truth of the statement, but rather to show why the police acted in the way they did. The fact that the statements made by Castro were not admitted into evidence to prove the truth of the matter asserted removes those statements from the definition of hearsay. The trial court explained this limitation to the jury.

> [Defense Counsel]: I'm going to object, Your Honor. Hearsay.
>
> THE COURT: Okay. Response?

[Prosecutor]: I would note that we're offering it solely for the effect of the listener, not for the truth of the matter asserted, so what he did with the information he received.

The Court: Okay. Ladies and gentlemen, what's happening is they're going to ask for a statement made by another individual. Okay. Generally speaking, that's called hearsay. However, there are certain exceptions to the hearsay rule, including when it's offered to explain what the officer may have done thereafter. Okay. You're not to accept the statement of the other individual, Mr. Roque [sic], as being true. You're simply to accept it as to explain what this officer did next. Okay.

So I'll overrule the objection and you may proceed.

N.T. Trial, V. 1, 7/20-21/2015, p. 110.

Additionally, defense counsel eventually agreed with this ruling.

[Prosecutor]: … And generally, what did he [Castro] tell you?

[Defense Counsel]: Objection, Your Honor. Hearsay.
The Court: Okay. Response?

[Prosecutor]: It will be the same thing I noted yesterday, not offering it for the truth of the matter asserted, but what the police did with that information.

THE COURT: To explain a course of conduct?

[Prosecutor]: Yes.

THE COURT: Okay. Any response to that?

[Defense Counsel]: If it's limited to that, Your Honor.

THE COURT: Okay. I'll overrule the objection.

*Id*. at 222.

Because the statements complained of are not defined as hearsay and because defense counsel ultimately agreed with the trial court's ruling, Schwenk is not entitled to relief on this issue.

Finally, Schwenk argues there was insufficient evidence to support his conviction for third-degree murder. Basically, Schwenk argues there is so much evidence pointing to Rodriguez as being the shooter, it renders the evidence against him insufficient to support his conviction. The Commonwealth has claimed this argument is waived because it was not included in Schwenk's Pa.R.A.P. 1925(b) statement. Our review of the certified record confirms the Commonwealth's assertion.

Schwenk filed his 1925(b) statement of matters complained of on appeal on March 15, 2018. In it, he claimed the trial court erred in not granting a new trial based on insufficient evidence "as proved by inconsistent verdict." Pa.R.A.P. 1925(b) Statement, ¶ 6. Schwenk's current argument has nothing to do with an inconsistent verdict; his current argument is simply an attempt to implicate another person, specifically Ashley Rodriguez. Because his current argument was not raised before the trial court, it has been waived. "Issues not included in the [1925(b)] Statement and/or not raised in accordance with the provision of this paragraph (b)(4) are waived." *Commonwealth v. Peralta*, 173 A.3d 813, 816 (Pa. Super. 2017). Additionally, "[o]ur rules of appellate procedure provide that '[i]ssues not raised in the lower court are waived and cannot be raised for the first time on

appeal.' Pa.R.A.P. 302(a)." ***Commonwealth v. Smith***, 206 A.3d 551, 564 (Pa. Super. 2019).

In an abundance of caution, we note our agreement with the trial court's analysis of the sufficiency of the evidence, and substantively rely thereupon. Briefly, the evidence showed, among other evidence: (a) Schwenk had gunshot residue on his hands immediately after the shooting; (b) a man matching his description was seen attempting to pick up shell casings at the crime scene and subsequently ran into a nearby apartment where Schwenk was located; (c) Schwenk was seen chasing after Gallon at which time gunshots were heard; and (d) jailhouse informants claimed Schwenk admitted to the shooting and sought to frame Rodriquez. There was sufficient evidence for the jury to convict Schwenk.

Judgment of sentence affirmed. The parties are directed to attach a copy of the trial court opinion in the event of further proceedings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/6/2019

- 16 -

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNYSLVANIA

  :   No. CR-656-2014

v.

CHRISTOPHER LEE SCHWENK
Appellant

**OPINION IN SUPPORT OF ORDER PURSUANT TO Pa.R.A.P. 1925(a)**

Appellant Christopher Lee Schwenk appeals to the Superior Court of Pennsylvania from the Order of October 8, 2015 Sentencing Appellant. On December 8, 2017, Appellant's PCRA petition was granted and restored Appellant's direct appeal rights. On December 11, 2017, Appellant filed a Notice of Appeal. Appellant then filed a Statement of Matters Complained on March 15, 2018 after the lower court allowed Appellant additional time in preparing the statement. The lower court now issues this 1925(a) Opinion.

## PROCEDURAL HISTORY

Appellant had his formal arraignment on March 3, 2014. At this time, Appellant was represented by court-appointed counsel, John M.

Hamme, Esquire. Sandra Thompson, Esquire then entered her appearance on approximately November 21, 2015.

On July 27, 2015, a week long jury trial before Honorable Thomas H. Kelley ("trial court") concluded.

During trial, on July 23, 2015, the trial court granted in part and denied in part Appellant's proposed jury instructions. The trial court denied 3 instructions: first, "Defendant's Statements or Expressions of Willingness to Accept a Plea/Deal"; second, 2.07 "Significance of Statements and Acts of Court and Counsel"; and third, 3.21A "Failure to Call Potential Witness."

The jury convicted Appellant of Third Degree Murder. On October 8, 2015, Appellant was sentenced to serve 20 to 40 years imprisonment.

Appellant was represented by Seamus D. Dubbs, Esquire for purposes of appeal. Appellant filed a PCRA petition and hearing was scheduled before Honorable Harry M. Ness ("the lower court"), who has since been assigned this matter. The lower court found that Appellant's appellate counsel was ineffective and restored Appellant's direct appeal rights. Appellant is now represented by Christopher Moore, Esquire.

2

In his statement, Appellant alleges 6 issues to be considered by this Court:

1) Whether the trial court erred in denying Appellant's motion to recuse Judge Kelley;

2) Whether the trial court erred in denying Appellant's proposed jury instructions;

3) Whether the trial court erred in denying Appellant's suppression motion as being untimely;

4) Whether the trial court erred in admitting telephone records to be played before the jury;

5) Whether the trial court erred in admitting the statements of Roque Castro as not hearsay; and

6) Whether the trial court erred in weighing the sufficiency of the evidence.

3

## ISSUES FOR APPEAL

Whether the trial court erred in denying recusal when Judge Kelley remained impartial without bias; in denying proposed instructions when the standard instructions used were applicable and efficient; in denying a suppression motion when that motion was filed more than 30 days after formal arraignment; in admitting telephone recordings when defense did not object timely; in admitting out of court statements when the statements were used to show a course of conduct; and in weighing the sufficiency of the evidence when forensic records and testimony revealed Appellant had possession of and used the murder weapon.

## FACTUAL BACKGROUND

At trial, Mary Sherman testified that she was delivering newspapers in the early morning in York City on November 6, 2013 when she heard multiple gunshots and saw a body in the street. Transcript of Trial, 7/20/2015, at 190.

York City Police Officer Christopher Roosen testified that he responded to a shooting at approximately 3:37 in the morning. Id. at 108. Officer Roosen testified that there was an unconscious woman lying in the street. Id. at 109. The victim was later identified to be

4

Monique Nixon. Id. at 114. Officer Roosen testified that he encountered a Hispanic male, named Roque Castro. Id. at 110.

Officer Roosen testified that Castro stated to Officer Roosen that Castro saw a black male "'attempting to pick up shell casings and run into'" a nearby apartment. Id. at 111. Castro also stated to Officer Roosen that Castro had overheard an argument and heard glass break at that apartment before the shooting occurred. Id. Officer Roosen testified that the victim was laying a city block away. Id. at 115. Officer Roosen testified that he relayed this information to his supervisor. Id. 121.

Officer Roosen further testified that he had secured the crime scene where 9 millimeter FC luger casings were recovered. Id. at 116.

Detective First Class Jeffrey Spence of the York City Police Department testified that he was the detective supervisor and oversaw other detectives at the time of this case. Transcript of Trial, 7/22/15, at 41. Detective First Class Spence testified that he was informed to go the apartment at 230 South Queen Street to meet Officer Roosen who had secured the perimeter of the apartment. Id. at 42. Detective First Class Spence testified that he spoke to Ashley Rodriguez at the apartment

5

and that she would not allow the detectives to enter. Id. at 43. Detective First Class Spence testified that he ordered everyone in the apartment to come outside. Id. at 43.

Detective First Class Spence testified that Ashley Rodriguez stated to him that her friend, Appellant, was inside and could not get him up. Id. at 44. Detective First Class Spence testified that the detectives waited outside the door for 10 to 20 minutes and that he felt the situation had become unsafe. Id. at 56. Detective First Class Spence testified that he made the "command decision" to enter the apartment and make contact with Appellant. Id. at 44.

Detective Andy Baez of the York City Police Department testified that he was with Detective First Class Spence when they were waiting for Appellant to exit the apartment. Transcript of Trial, 7/21/15, at 226. Detective Baez testified that from outside the apartment he could see Ashley Rodriguez leaning into a bedroom from the kitchen and could hear her talking with Appellant. Id. Detective Baez testified that when they entered, they found Appellant naked laying on the bed. Detective Baez testified that he handcuffed Appellant for officer safety reasons. Id.

6

Detective Anthony Fetrow of the York City Police Department testified he was with the other detectives at the apartment. Transcript of Trial, 7/20/15, at 196. Detective Fetrow testified that he searched Ashley Rodriguez's bedroom and found a 9 millimeter handgun. Id. Detective Fetrow testified that the handgun was a Smith & Wesson that was capable of holding 16 rounds, but was only loaded with 6 rounds. Id. at 199.

Detective First Class Spence further testified that everyone in the apartment was taken to the police station. Transcript of Trial, 7/22/15 at 45. Detective First Class Spencer testified that he interviewed Ashley Rodriguez 3 times and that it was not until the third interview that Ashley Rodriguez mentioned that there was a man named Eddie Gallon who held a gun to her head. Id. at 62.

The Affiant, Detective Travis Sowers of the York City Police Department, testified that Appellant consented to collections for DNA swabs and gunshot residue. Id. at 99. The Affiant testified that he interviewed Appellant, Ashley Rodriguez, a man named Jose Rivera, and his mother, Charlotte Hollinger. Id. at 98. The Affiant testified that

7

everyone stated that Ashley Rodriguez did not fire the handgun. Id. at 102.

The Affiant testified that he later interviewed Eddie Gallon and collected DNA samples from him as well as Ashley Rodriguez. Id. at 104. The Affiant testified that he also interviewed a man named Douglas Otteson, after an ATF firearm trace revealed Otteson to be the original owner of the handgun. Id. at 105. The Affiant testified that Otteson stated to the Affiant that Otteson did own the handgun and that he sold it in 2013 to Benjamin Rodriguez for heroin. Id.

Ashley Rodriguez testified that she was in a sexual relationship with Appellant. Transcript of Trial, 7/20/15, at 132. Ashley Rodriguez testified that she and Appellant were drinking and celebrating a birthday on the night of the shooting. Id. at 127. Ashley Rodriguez testified that she and Appellant went to McDonalds and then returned to her mother's apartment at 230 South Queen Street. Id. at 128.

Ashley Rodriguez testified that when she returned home, she was approached by her ex-boyfriend, Eddie Gallon after she got out of the car. Id. at 129. Ashley Rodriguez testified that Appellant got out of the car when Eddie Gallon pulled a gun on Ashley Rodriguez's head. Id. at

8

130. Ashley Rodriguez testified that Appellant pushed Eddie Gallon and that a struggle ensued between Appellant and Eddie Gallon. Id. Ashley Rodriguez testified that Appellant and Eddie Gallon went down to the corner from where she could hear arguing and yelling, and ultimately gunshots. Id. at 131. Ashley Rodriguez testified that she and Appellant then proceeded into the apartment to have sex. Id. at 132. Ashley Rodriguez testified that at some point later, the window to the living room was broken. Id. at 157.

Ashley Rodriguez testified that when the police arrived, Appellant was knocked out from being drunk. Id. at 133.

Eddie Gallon testified that at the time of the incident, Ashley Rodriguez was her girlfriend and that she lived at his residence. Transcript of Trial, 7/21/15, at 261. Eddie Gallon testified that on the night of the shooting that Ashley Rodriguez kept calling him and cursing at him. Id. Eddie Gallon testified that he walked over to Ashley Rodriguez's mother's house when he encountered Appellant get of the car. Id. at 262. Eddie Gallon testified that he had never seen Appellant before. Id. at 263. Eddie Gallon testified that Appellant began arguing with him outside of the apartment. Id. at 264.

9

Eddie Gallon testified that he started walking away but stopped when Appellant continued yelling at him. Id. at 267 – 268. Eddie Gallon testified that he had walked past an older lady walking on the street. Id. Eddie Gallon testified that he picked up a couple of rocks to throw at Appellant, but he had lost sight of Appellant. Id. at 270. Eddie Gallon testified that he went back to Ashley Rodriguez's mother's house and broke a window. Id. Eddie Gallon testified that he was jogging away when he heard gunshots, but didn't see anyone else. Id. at 271.

Eddie Gallon testified that there was a PFA against him from Ashley Rodriguez that had expired in September of 2013, but that their relationship was still ongoing. Id. at 276. Eddie Gallon testified that he did not have a gun and that he was not sure Appellant had a gun. Id at 282 – 285.

Charlotte Hollinger testified that she is the mother of Ashley Rodriguez and that the apartment was Ashley Rodriguez's and not her own. Transcript of Trial, 7/23/15, at 98. Hollinger testified that she was living with Ashley Rodriguez temporarily because of prior incidents with Eddie Gallon. Id. Hollinger testified that Eddie Gallon and Ashley Rodriguez broke up 6 months before the shooting occurred. Id. at 100.

Hollinger testified that Eddie Gallon had previously threatened the whole family and had previously tormented Ashley Rodriguez. Id. at 103. Hollinger further testified that she did not hear the shooting in question. Id. at 106.

Jose Rivera testified that he was living with her sister, Ashley Rodriguez, at the time of the shooting. Id. at 107. Rivera testified that Eddie Gallon had previously flashed a gun towards him. Id. at 109. Rivera testified that he did not hear the shooting in the question. Id. at 108. Rivera testified that he did not shoot at Eddie Gallon. Id. at 115.

The Affiant further testified that Ashley Rodriguez told him that she was standing by her car when the "gunshot went off." Transcript of Trial, 7/22/15, at 123. The Affiant testified that Ashley Rodriguez never even mentioned Eddie Gallon was at the scene in her first interview. Id.

Douglas Otteson testified that he sold his Smith & Wesson 9 millimeter handgun to a friend of Benjamin Rodriguez. Transcript of Trial, 7/23/15, at 18. Otteson testified that Benjamin Rodriguez helped Otteson sell the handgun. Id. Otteson testified that he sold the handgun to a black male, about 6 feet tall. Id. at 20. Otteson testified Benjamin Rodriguez gave him heroin in return. Id. at 23.

11

Benjamin Rodriguez testified that his niece is Ashley Rodriguez. Id. at 30. Benjamin Rodriguez testified that he helped Otteson sell firearms while he sold Otteson drugs. Id. at 32.

The Commonwealth and Appellant agreed to a stipulation that Dr. Bollinger conducted an autopsy on the victim and determined that the victim died from one gunshot wound. Transcript of Trial, 7/22/15, at 12.

Officer Ryan Anderson of the York City Police Department testified that he witnessed the autopsy and obtained the bullet. Transcript of Trial, 7/21/17, at 251. Officer Anderson testified that the bullet was submitted to the Pennsylvania State Police Forensic Lab for testing. Id. at 254.

Pennsylvania State Police Sergeant David Krumbine testified that he performed forensic tests on the Smith & Wesson handgun, the ammunition found inside the handgun, the bullet from the victim, and the spent shell casings from the scene of the shooting. Id. at 316. Sgt. Krumbine testified that the handgun was functional and capable of firing the type of ammunition that was found. Id. at 319. Sgt. Krumbine

testified that the spent shell casings and the bullet were fired by the Smith & Wesson 9 millimeter handgun. Id. at 323.

Jillian Fesolovich, a forensic biologist of NMS Labs testified that she tested the handgun and the loaded ammunition for DNA. Id. at 330. Fesolovich testified that Ashley Rodriguez "could not be excluded as the potential major source contributor" to the DNA found. Id. at 332. Fesolovich testified that a major contributor does not necessarily mean that they were the last person to touch something. Id. at 334.

Stephanie Horner, a forensic scientist of RJ Lee Group, testified that she tested samples from Appellant's hands for gunshot residue. Id at 393. Horner testified that there was gunshot residue on these samples. Id. at 400.

Christopher Harris testified that he was imprisoned in the same jail cell as Appellant in 2014. Transcript of Trial, 7/22/15, at 16. Harris testified that Appellant told him that Appellant chased Eddie Gallon and shot at him and then went back inside and had sex with Ashley Rodriguez. Id. at 20. Harris testified that Appellant told him that Ashley Rodriguez wiped the handgun clean after they had sex and then hid the handgun. Id. at 21 - 22.

13

Brandon Dawson testified that he was imprisoned with the Appellant and that Appellant told him that Appellant shot at Eddie Gallon. Id. at 78. Dawson testified that Appellant wanted to "undermine the system by having a guy by the name of Glenn Jones come in and testify that he was at the gun range with [Appellant] that day." Id. at 79. Dawson testified that Appellant asked Dawson to testify and say that Benjamin Rodriguez gave the handgun to Dawson and that Dawson sold the handgun to Ashley Rodriguez. Id. at 80. Dawson testified that Appellant said that there was a facebook picture with Ashely Rodriguez holding the handgun and that Appellant could frame the shooting on her. Id. Dawson said he did agree to this and told the authorities, which led to his current firearm charges. Id.

Anthony Rankins testified that he met Harris while incarcerated in the York County Prison. Id. at 141. Rankins testified he had known Dawson for 20 years. Id. Rankins testified that Harris and Dawson approached him with a plot to make up testimony to enable better plea agreements. Id. Rankins testified that Dawson believed he was the mastermind. Id. Rankins testified that he declined joining the plot. Id. at 143. Rankins testified that he was friends with Appellant's brother.

14

Id. at 146. Rankins testified that he told Appellant of this plot. Id. at 150.

Brandon Elliot testified that he was friends with Appellant and was incarcerated at the same time as Dawson. Transcript of Trial, 7/23/15 at 5. Elliot testified that Dawson was going around telling everyone that he was going to "tell on people." Id. at 10.

The Affiant further testified that he collected phone calls made by Appellant to Maria Nicholas, who was Appellant's "baby's mom." Transcript of Trial, 7/22/15, at 107.

Maria Nicholas testified that she is the mother of Appellant's children. Transcript of Trial, 7/23/15 at 50. Nicholas testified that she did not want to see Appellant get in trouble and that Appellant had not admitted to the charges in her phone conversation. Id. at 52 - 55.

# DISCUSSION

The trial court did not err because Judge Kelley was impartial; the necessary, standard jury instructions were used; the suppression motion was untimely; the objection to the telephone recordings was not properly preserved; the statements of Roque Castro were not hearsay; and there was sufficient evidence to convict Appellant with Third Degree Murder.

I.    *Denial of the Recusal Motion.*

The Code of Judicial Conduct states that a:

> judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:
> (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer ...

PA ST CJC Rule 2.11(A)(1).

There is a presumption that judges are "'honorable, fair and competent,'" and ... have the ability to determine whether they can rule impartially and without prejudice." Commonwealth v. Druce, 589, 848 A.2d 104, 108 (Pa. 2004) (citations omitted). The moving party in a recusal motion bears the burden of producing evidence showing bias, prejudice, or unfairness necessitating recusal, and that the "decision by a judge against whom a plea of prejudice is made will not be disturbed except for an abuse of discretion." Id.

16

A judge has to determine if there is a personal bias or interest which would preclude an impartial review. Goodheart v. Casey, 565 A.2d 757, 764 (Pa. 1989). This is a personal and unreviewable decision that only the jurist can make. Id. A judge must also satisfy the appearance of justice. Id.

Appellant argues that Judge Kelley failed to be impartial and was biased against his counsel, Sandra Thompson, Esquire. Judge Kelley warned Thompson to not talk over him several times during status hearings leading up to trial, however Judge Kelley stated that his pre-trial rulings were on the merits and not indicative of any animosity..

While Judge Kelley later proceeded to warn Attorney Thompson several times out of the presence of the jury, Appellant's pre-trial motion lacked evidence of bias and prejudice to disturb the presumption of Judge Kelley's ability to be impartial. Ultimately, no contempt hearing was held, and Judge Kelley ruled in favor of both parties at various times during the jury trial.

Therefore, Judge Kelley was impartial and lacked any bias against Appellant or Attorney Thompson to warrant a recusal.

## II.  *Denial of Appellant's proposed jury instructions.*

The trial court denied 3 instructions: first, "Defendant's Statements or Expressions of Willingness to Accept a Plea/Deal"; second, 2.07 "Significance of Statements and Acts of Court and Counsel"; and third, 3.21A "Failure to Call Potential Witness."

Appellant first argues that Rule 410 of the Pennsylvania Rules of Evidence should have been instructed to the jury in regards to Appellant's telephone call with Maria Nicholas and their discussions of potential plea agreements between Appellant and the Commonwealth. Rule 410 states that evidence of participating in plea discussions is not admissible against the defendant. Pa.R.E. Rule 410(a). Appellant freely entered into a recorded telephone conversation with Maria Nicholas, not with the Commonwealth for the specific purpose of plea bargaining. *See* Commonwealth v. Calloway, 459 A.2d 795, 801 (Pa. Super. 1983).

Because an additional jury instruction to address how the jury should perform its role was redundant, this proposed instruction did not need to be granted.

18

Appellant argues that 2.07 of the standard jury instructions should have been granted to remind the jury to not accept what attorneys or the judge says as testimony. The jury was given this instruction by the court when the trial began. The trial court did not believe it was necessary to give it again after the trial, in addition to the other numerous instructions. Because, the instruction was already given, this proposed instruction did not need to be granted.

Appellant argues that 3.21A of the standard jury instructions should have been granted because of the admissibility of Roque Castro's statements as an exception to hearsay. 3.21A requires the jury to find 3 conjunctive elements in order to draw inferences about the failure to call a potential witness:

> First, the person is available to that party only and not to the other; Second, it appears the person has special information material to the issue; and Third, the person's testimony would not be merely cumulative.

3.21A (Crim) Failure to Call Potential Witness, Pa. SSJI (Crim), §3.21A (2016).

Roque Castro's identity and address was made known to Appellant prior to trial. The Commonwealth did not prevent Castro from being unavailable to Appellant. Because the jury should not have

been given the opportunity to draw any inferences, this proposed jury instruction could not have been granted.

Therefore, the trial court did not abuse its discretion in denying these proposed jury instructions.

III. *Denial of Appellant's suppression motion.*

Unless the opportunity did not previously exist, or the interests of justice otherwise require, a suppression motion can only be made in the omnibus pretrial motion as set forth in Rule 578. Pa. R. Crim. P. 581(B). If a timely motion is not made, "the issue of suppression of such evidence shall be deemed to be waived." Id.

The omnibus pretrial motion must be filed within 30 days after formal arraignment, "unless opportunity therefor did not exist, or the defendant or defense attorney, or the attorney for the Commonwealth, was not aware of the grounds for the motion, or unless the time for filing has been extended by the court for cause shown." Pa. R. Crim. P. 579(A).

20

Attorney Thompson filed two suppression motions as part of the omnibus motion on December 22, 2014. Appellant's formal arraignment occurred on March 3, 2014. The trial court did not allow a suppression hearing on matters that involved discovery while Appellant was previously represented by Attorney Humme. Attorney Humme did not file the suppression motion in question within 30 days of formal arraignment. A hearing was held on the other motions because they involved issues that arose after Attorney Thompson entered her appearance on behalf of Appellant.

Nothing has been provided to show that any party or any attorney was unaware of the grounds for a suppression motion of the initial search at Ashley Rodriguez's apartment. Nothing has been provided that the motion could not have been filed sooner.

Therefore, Appellant's motion to suppress is waived because the motion was filed after the 30 day deadline without exception.

## IV.  *Admissibility of telephone records.*

Each error "identified in the [concise statement] will be deemed to include every subsidiary issue contained therein which was raised in the trial court." Pa.R.A.P. 1925. (b)(4)(v).

Issues must be raised "prior to trial, during trial, or in a timely post-sentence motion to be preserved for appeal." Commonwealth v. Tejada, 107 A.3d 788, 799 (Pa. Super. 2015).

Appellant argues that the phone call between Appellant and Maria Nicholas should not have been played to the jury. When the Commonwealth introduced the recording, there was no objection by Attorney Thompson. There was then a 14 minute recess without any objections made. The entirety of the 20 minutes phone call was then played to the jury without objection. Nothing in the record indicates that after the trial that the jury replayed the phone call or that Attorney Thompson objected to the jury having the phone call recording with them for deliberations.

Therefore, the inadmissibility of the phone call was not preserved for appeal when Attorney Thompson failed to object.

## V.   *Admissibility of statements of Roque Castro.*

The admissibility of evidence is held to an abuse of discretion standard. Commonwealth v. Dent, 837 A.2d 571, 577 (Pa. Super. 2003) (citations omitted). Hearsay is a statement that the declarant does not make while testifying at trial; and "a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Testimony to prove a course of conduct is not hearsay. Id.

Roque Castro did not testify at trial, however his testimony directly led York City Police detectives to Ashley Rodriguez's apartment where Appellant was located and arrested. Several officers and detectives testified to what Castro said and to how they responded in their investigative efforts to pursue Appellant.

Attorney Thompson made the hearsay objection each time a witness described this interaction with Castro. The trial court made it clear to the jury that the testimony of Castro was to be used for only for the limited purpose of describing why the police arrived at Ashley Rodriguez's apartment.

Therefore, Castro's statements were admissible as not hearsay.

23

## VI. *Sufficiency of the Evidence.*

Finally, Appellant raises a sufficiency of the evidence claim. The standard for reviewing the sufficiency of the evidence is:

> "whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt."

Commonwealth v. Charlton, 902 A.2d 554, 563 (Pa. Super. 2006) (citations omitted).

The Commonwealth may sustain its burden of proving every element of the crime "beyond a reasonable doubt by means of wholly circumstantial evidence." Id.

Murder is categorized as:

> (a) Murder of the first degree.--A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
>
> (b) Murder of the second degree.--A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.
>
> (c) Murder of the third degree.--All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa.C.S.A. § 2502.

24

"Although the statute itself only defines third-degree murder as a catch-all without describing the elements of the offense, third degree murder is 'an unlawful killing with malice but without specific intent to kill.'" United States v. Marrero, 743 F.3d 389, 397 (3d Cir. 2014 quoting Commonwealth v. Dunphy, 20 A.3d 1215, 1219 (Pa. Super. 2011)).

"Malice" is defined as:

'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured,' [and] malice may be found where the defendant consciously disregarded an unjustifiable and extremely high risk that his actions might cause serious bodily injury.

United States v. Marrero, 743 F.3d 389, 397 (3d Cir. 2014) (citations omitted).

The 9 millimeter Smith & Wesson handgun that fired the bullet that killed Monique Nixon was found near Appellant in Ashley Rodriguez's bedroom not long after the shooting. The ATF firearm trace revealed that the handgun transferred from Douglas Otteson to his drug dealer, Benjamin Rodriguez, and then to Benjamin Rodriguez's niece's friend, Appellant. The gunshot residue samples were taken from Appellant's hands not long after the shooting. While DNA evidence

25

shows Ashley Rodriguez touched the handgun at some point, all the testimonial evidence points to Appellant being the shooter.

Ashley Rodriguez, her brother and mother, and Appellant all told the Affiant that Ashley Rodriguez was not the shooter. Yet, no one stated that Appellant was not the shooter.

Ashley Rodriguez gave inconsistent accounts of Eddie Gallon being at the scene and having a firearm. Ashley Rodriguez testified at trial that the window breaking occurred after the shooting, while Eddie Gallon testified that he broke the window before hearing gunshots. Ashley Rodriguez also testified at trial that she knew Appellant had pursued Eddie Gallon down the street and heard gunshots, then promptly returned to her bedroom to have sex, seemingly shocked and angered that the police show up soon afterwards. Appellant was then found intoxicated in bed.

The testimony of the inmates puts 2 unassociated inmates against 2 other inmates who were friends with or somehow associated with Appellant. Overall, the 4 inmates' testimony was indicative of some sort of cover-up plan by Appellant to shift blame on Ashley Rodriguez. The

26

testimony of inmate Christopher Harris revealed an admission of guilt by Appellant.

All of the evidence shows that Eddie Gallon and Ashley Rodriguez were in the process of ending a tumultuous relationship and that after a night of drinking, Eddie Gallon attempted to confront Ashely Rodriguez in the middle of the night. This confrontation led to Appellant intervening against Eddie Gallon with an intense argument before Eddie Gallon attempted to walk off. Appellant provoked Eddie Gallon to return with a last ditch effort to give the final word by breaking a window. This led Appellant to run outside and fire his Smith & Wesson handgun, which he had received from Ashley's uncle, and fire it at or in the direction of the first person he saw in the night.

Eddie Gallon had already retreated from breaking the window while Monique Nixon was unfortunately walking on Queen Street where Appellant had last seen Eddie Gallon.

Appellant escalated the argument by bringing a firearm, showing a mindset regardless of social duty. Appellant's firing of the handgun was reckless of the consequences of who was outside walking on the street or who was inside any building nearby. Appellant may or may not

have intended to shoot Eddie Gallon and most certainly did not intend to shoot an innocent bystander. However, malice existed because shooting into the dark was a conscious disregarded of an unjustifiable and extremely high risk that might cause serious bodily injury in a needless effort to escalate an argument over a woman.

Thus, the trial court found Appellant was guilty of Third Degree Murder with sufficient evidence beyond a reasonable doubt.

## CONCLUSION

In conclusion, the lower court respectfully requests that this Court affirm the trial court's denial of Appellant's motions and affirm the trial court's sentence.

Harry M. Ness
Judge of the Court of Common Pleas